IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA            CR No. 1:21-cr-00023-TJK-1

v.                                  Washington, D.C.
                                    Thursday, January 13, 2022
JOSHUA PRUITT,                      3:00 p.m.

                    Defendant.
- - - - - - - - - - - - - - - - - x
_____

     TRANSCRIPT OF BOND REVOCATION HEARING & STATUS CONFERENCE
          HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:     Alexis J. Loeb, Esq.
                           U.S. ATTORNEY'S OFFICE FOR THE
                           NORTHERN DISTRICT OF CALIFORNIA
                           450 Golden Gate Avenue
                           11th Floor
                           San Francisco, CA 94102
                           (415) 436-7168


For the Defendant:         Robert L. Jenkins, Jr., Esq.
                           BYNUM & JENKINS, PLLC
                           1010 Cameron Street
                           Alexandria, VA 22314
                           (703) 309-0899


Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                     **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3      Criminal Matter 21-23, United States of America v. Joshua

4      Pruitt.

5              Present for the Government is Alexis Loeb; present

6      for the defendant is Robert Jenkins; present from Pretrial

7      Services is Christine Schuck; also present is the defendant,

8      Mr. Pruitt.

9              THE COURT:  All right.  Well, good afternoon,

10     everyone.

11             We have a number -- we are here for a status and a

12     hearing on the Government's, (inaudible) -- motion to revoke

13     and for an arraignment.  So we have a number of things we

14     can get accomplished here today.

15             So first, let me ask, Mr. Jenkins, does your

16     client consent to being arraigned via videoconference as we

17     are proceeding here today?

18             MR. JENKINS:  Good afternoon, Your Honor.  May it

19     please the Court.  Robert Jenkins on behalf of the

20     defendant, Mr. Pruitt.

21             Mr. Pruitt does consent to participating remotely.

22     Specifically, to being arraigned on the latest superseding

23     indictment.

24             THE COURT:  All right.

25             MS. LOEB:  And --

```
 1                    THE COURT:  So --
 2                    MS. LOEB:  Your Honor, I'm sorry to jump in.  Did
 3     we already arraign the defendant on November 18th?
 4                    THE COURT:  Oh.  Did we not -- is today not set
 5     for an arraignment?  Why did I think that it was?
 6                    Ms. Harris --
 7                    THE DEPUTY CLERK:  Yeah, I didn't know about an
 8     arraignment today either.  That's what --
 9                    THE COURT:  All right.
10                    THE DEPUTY CLERK:  -- I was just checking, because
11     I have -- I don't have --
12                    THE COURT:  All right.
13                    THE DEPUTY CLERK:  -- a new indictment since --
14                    THE COURT:  All right.  Very well.  So we did
15     accomplish that, all right, the last time we were here.  So
16     we don't have that.  Maybe that's just a reflection of a lot
17     of activity in the courthouse these days.  All right.  So we
18     don't have an arraignment, but we do have, then, a number of
19     other things we can accomplish.
20                    Before we get to the Government's motion to
21     revoke, I do want to -- perhaps this is what was in my head,
22     another thing I do want to get done today.  I know the
23     parties were, I'm sure in this case, looking at my -- were
24     awaiting both rulings from me and rulings from other judges
25     on our court on the 1512 issue.  And, Mr. Jenkins and
```

1    Ms. Loeb, I trust you both saw my ruling in Nordean and then

2    there were rulings from, I think, at least four -- I think

3    four, maybe, five other judges on the same point all coming

4    out the same way.  So let me just go ahead and -- I'm going

5    to go ahead and orally just deny that motion for

6    substantially the same reasons I did in Nordean, the

7    outstanding issue that Mr. Pruitt has here.

8              So before the Court is the defendant's motion to

9    dismiss Count 2 of the originally filed indictment.  That's

10   ECF No. 14.  The Government has filed a superseding

11   indictment since the defendant filed his motion to dismiss,

12   ECF No. 30, for which we have already arraigned him on.

13   Although I could not find case law from this Circuit on this

14   point, it appears that the general rule across the federal

15   system is that superseding indictments do not automatically

16   moot a previously filed motion to dismiss.  But if the

17   superseding indictment cures deficiencies raised in a motion

18   to dismiss, then the superseding indictment would moot those

19   deficiency arguments.  As I will explain, because the

20   superseding indictment here does not address any of the

21   defendant's arguments, I don't consider and I won't deny the

22   motion to dismiss as moot.  That said, I will still deny it

23   on its merits, and I would deny it to the extent that the

24   defendant seeks to apply it to the most recent superseding

25   indictment.

1          Count 2 of the original indictment charges

2     defendant with corruptly obstructing, influencing, and

3     impeding an official proceeding by entering and remaining in

4     the United States Capitol without authority, committing an

5     act of civil disorder, and engaging in disorderly and

6     disruptive conduct.  Defendant argues that the indictment

7     does not sufficiently allege that he obstructed, influenced,

8     or impeded an official proceeding because Congress's

9     certification of the Electoral College vote on January 6th

10    of last year was not an "official proceeding" within the

11    meaning of the statute.  According to the defendant, the

12    certification does not qualify because it does not have a

13    quasi-judicial function.  And if "official proceeding" is

14    read to include Congress's certification, the defendant

15    argues that 1512(c)(2) renders 18 United States Code 1505

16    superfluous and will -- and also, would chill the

17    constitutionally protected right to protest.

18          So as I made clear in my ruling in another case, I

19    disagreed with those arguments.  Section 1515 of Title 18

20    defines "official proceeding" as it is used in Section 1512.

21    And it specifically provides that "official proceeding"

22    means, among other things, a proceeding before the Congress.

23    And as explained in depth in my opinion in the Nordean case

24    -- that's 21-cr-175; it's ECF No. 263 in that case, and

25    specifically here referencing Pages 10 and 11 -- such a

1    proceeding need only be a series of actions that require

2    some formal convocation by the Congress.  And because

3    Congress's certification is a series of actions that

4    requires some formal convocation, it is a proceeding before

5    the Congress and thus an official proceeding.  The rule of

6    lenity does not require a different conclusion, as that

7    doctrine only applies when there's some ambiguity in the

8    statute, and there is no ambiguity here.  Besides, even if a

9    proceeding before the Congress did require some

10   quasi-judicial function, the certification would still

11   qualify because Congress's certification has some of those

12   features.  It is formal.  Someone presides over it.  There

13   are objections.  And it ends with a result declared.  I

14   should have said, I guess, the part about the rule of

15   ambiguity, I addressed at Page 27 of that opinion; and the

16   part about the quasi-judicial functions, I addressed on Page

17   12.

18           In any event, I also disagree that applying

19   "official proceeding" to Congress's certification of the

20   Electoral College vote either renders 18 United States Code

21   Section 1505 superfluous or violates the First Amendment.

22   To be sure, 1505 does concern obstructing a congressional

23   inquiry or investigation.  But as I noted in the Nordean

24   opinion, it's not clear that a congressional inquiry or

25   investigation would necessarily, or inevitably, qualify as a

1    proceeding before the Congress.  And, again, that's Page 17,

2    Note 6 of that opinion.  And even if there were some

3    overlap, The preference -- quote, The preference for

4    avoiding surplusage constructions is not absolute.  That's

5    the Supreme Court in Lamie v. United States Trustee, 540

6    U.S. 526 at 536, a -- Supreme Court from 2004.  And as for

7    defendant's First Amendment concerns, as I explained in that

8    same opinion, by focusing on corrupt actions, Section

9    1512(c)(2) does not reach protected free speech.  That's

10   Page 30 of that opinion.

11         So for all those reasons, I will deny Mr. Pruitt's

12   motion to dismiss Count 2 of the originally filed super- --

13   the original filed -- originally filed indictment.

14         All right.  So the other thing I have before me is

15   the Government's motion to revoke under 18 United States

16   Code 3148.  That's ECF No. 33 on the docket.  The

17   Government's motion comes after Pretrial Services filed a

18   violation report recommending that Mr. Pruitt be removed

19   from the High Intensity Supervision Program because his

20   repeated -- of his repeated violations of his curfew which

21   was imposed as a condition of his pretrial release.  That is

22   ECF No. 32.

23         So why don't I just start -- before I hear from

24   the Government and, of course, Mr. Jenkins, why don't I hear

25   -- Ms. Schuck, if I can hear from you, I think it would be

1    helpful to start out.  I looked at the supplement you filed

2    on Monday and you do detail those curfew violations.  It

3    looks like you've focused in on seven dates.  If you could

4    just walk me through each of those dates.  And some of this

5    information is in the report you filed and some of it isn't,

6    but -- I -- at least I didn't see that it was.  But what I'm

7    particularly interested in knowing, sort of, whether this

8    was a date where Mr. Pruitt had permission to work and, if

9    so, when he had permission to work, and then -- so whether

10   he was at work at all that day one way or the other, and

11   then -- or was this a situation where he had permission to

12   work to a particular time or something, but in these cases,

13   you know -- what -- when the GPS shows he -- if he was at

14   work, when it shows he left work; what he did between work

15   and home; and then, of course, whether he -- or where he was

16   in particular, I guess -- and then whether he, on each of

17   these occasions, asked permission to be out past his curfew

18   beforehand or even afterward came to Pretrial with an

19   explanation and, sort of, seeking to make sure he was in

20   compliance afterward.

21          THE PROBATION OFFICER:  Good afternoon, Your

22   Honor.  Christine Schuck, Pretrial Services.

23          We submitted the report, plus we submitted about a

24   96-page supplement of all his GPS points which goes into

25   great detail about all his movements.  I can -- the report

```
 1        -- he is supervised by our High Intensity Supervision

 2     Program, our HISP Unit.  And the report outlines the general

 3     violations.  So basically, on -- the first one on November

 4     25th, he was not authorized to be outside his residence

 5     after 9:00 p.m.  So that is stated in the report.  On --

 6             THE COURT:  Right.

 7             THE PROBATION OFFICER:  -- December 11th --

 8             THE COURT:  Is that because --

 9             THE PROBATION OFFICER:  -- he was --

10             THE COURT:  Ms. Schuck, do you know, is that

11     because, on that day, he wasn't working at all or is all you

12     know that he just -- he wasn't working past 9:00 o'clock in

13     any event?

14             THE PROBATION OFFICER:  All --

15             THE DEFENDANT:  Why isn't David Cooper [ph] in

16     here --

17             THE PROBATION OFFICER:  Because here, for United

18     States District Court -- it's our office who represents in

19     United States District Court.  It's not the High Intensity

20     Supervision Program.

21             THE COURT:  Okay.  I'm sorry.  I didn't hear what

22     you just said.

23             THE PROBATION OFFICER:  Defense counsel asked why

24     Officer David Cooper is not in this hearing, and I --

25             THE COURT:  I see.
```

1          THE PROBATION OFFICER:  -- am representing that it

2     is the officers who are assigned to United States District

3     Court who represent cases before Your Honor, not the High

4     Intensity Supervision Program.

5          THE COURT:  All right.

6          MR. JENKINS:  Your Honor, I didn't ask any

7     questions, but --

8          THE COURT:  Okay.

9          THE PROBATION OFFICER:  Someone asked in there,

10    Why isn't it Mr. David Cooper?

11         MR. JENKINS:  Oh.

12         THE COURT:  All right.

13         MR. JENKINS:  Well, it wasn't defense counsel,

14    Your Honor.

15         THE COURT:  All right.  Very well.  Who was that?

16         THE DEPUTY CLERK:  It was the defendant, Your

17    Honor.

18         THE COURT:  Oh, all right.

19         Continue on, Ms. Schuck.  That day -- so do you

20    know one way or the other whether the defendant was working

21    at all that day or is -- all you have to go on is that,

22    maybe, he was working, but he wasn't working -- he didn't

23    have permission to work past 9:00 o'clock?

24         THE PROBATION OFFICER:  What I can attest to is

25    that he was not authorized to be outside his residence after

1      9:00 p.m.

2                  THE COURT:  All right.  Very well.

3                  Let's, then, move -- and this is one where, again,

4      he's out until -- I think it's 10:30 or so.

5                  THE PROBATION OFFICER:  10:36 p.m.

6                  THE COURT:  Right.  Okay.  And we don't have him

7      going, on that day, anywhere near -- in the -- do you know

8      whether, in that hour-and-a-half, he was anywhere near his

9      workplace?

10                 THE PROBATION OFFICER:  He was located at a

11     residence --

12                 THE DEFENDANT:  Feel free to look --

13                 THE PROBATION OFFICER:  -- in the area of --

14                 THE DEFENDANT:  Feel free to look the date up.

15     There was a snowstorm.  I was stuck.

16                 THE COURT:  Hold on.  Hold on.  Mr. Pruitt, is

17     that you speaking?

18                 THE DEFENDANT:  It is, sir.

19                 THE COURT:  All right.  You know --

20                 THE DEFENDANT:  Your Honor --

21                 THE COURT:  -- what?  You're going to --

22                 THE DEFENDANT:  Your Honor --

23                 THE COURT:  You're going to have to wait your

24     turn.  And you're going to have to wait not only your turn,

25     but first we're going to wait for your attorney's turn, and

```
 1    we'll see if he thinks it's a good idea for you to address

 2    these things yourself --

 3              THE DEFENDANT:  I --

 4              THE COURT:  -- but certainly --

 5              THE DEFENDANT:  -- understand, Your Honor --

 6              THE COURT:  But -- no, no, no, no.

 7              THE DEFENDANT:  -- and I apologize.

 8              THE COURT:  I just want -- I don't want to hear

 9    any more words out of your mouth, Mr. Pruitt.

10              THE DEFENDANT:  (Indicating.)

11              THE COURT:  All right.  Ms. Schuck, keep going.

12    So December 10th?

13              THE PROBATION OFFICER:  So on December -- he

14    returned home -- he left work on -- at approximately 12:48

15    a.m. on December 11th.

16              THE COURT:  Mm-hmm.

17              THE PROBATION OFFICER:  He was not authorized to

18    go anywhere other than to his place of employment.  He was

19    in the immediate area of a shopping center located at

20    Carothers Parkway in Franklin, Tennessee, from approximately

21    12:55 a.m. to 2:56 a.m. and then returned home at

22    approximately 3:37 a.m.  So on that date, he was authorized

23    to work, but he was not authorized to go any other place

24    other than his employment.

25              THE COURT:  All right.  And the authorization to
```

```
1    work was, basically, whenever his shift ended, he was, then,
2    to go directly home?
3               THE PROBATION OFFICER:  Yes, he has to go directly
4    home after -- so if his shift is after the 9:00 p.m. curfew,
5    then he has to go right home.
6               THE COURT:  Right.  Okay.  December --
7               THE PROBATION OFFICER:  Then on the evening of
8    December 12th, he returned home at approximately 12:48 a.m.
9    on December 13th.  He was in the area of 4th Avenue and
10   Broadway in Downtown Nashville from approximately 8:46 p.m.
11   to -- on the 12th to 12:22 a.m. on the 13th.  He was not
12   authorized to go to any other location other than his place
13   of employment.
14              THE COURT:  So --
15              THE PROBATION OFFICER:  So again --
16              THE COURT:  -- was that a day -- I'm sorry.  So
17   was that -- that was a day -- was there an expectation that
18   he was working on that day?  The 12th.
19              THE PROBATION OFFICER:  He was working, but he was
20   to go home directly after work.
21              THE COURT:  Okay.  So he could have -- again, it
22   was a situation where he could have been past the time of
23   9:00 o'clock; he just had to go straight home?
24              THE PROBATION OFFICER:  Correct --
25              THE COURT:  All right.
```

1          THE PROBATION OFFICER:  -- and he did not.

2          THE COURT:  And this has him leaving work at what

3     time?

4          THE PROBATION OFFICER:  We have him in the area of

5     -- in Downtown Nashville, Tennessee, from approximately 8:46

6     p.m. to 12:22 a.m.  So he was in the downtown area from that

7     time frame.

8          THE COURT:  Right.  But not at his place of

9     employment, then.

10         THE PROBATION OFFICER:  Correct.  Based on my

11    reading the report, he was not at work at -- during that

12    time; he was Downtown Nashville, and he was not authorized

13    to be there.

14         THE COURT:  Okay.

15         THE PROBATION OFFICER:  And then on the 18th -- he

16    did not arrive home until 1:36 a.m. on the 18th.  He went to

17    the area of, again, 4th Avenue and Broadway in Downtown

18    Nashville, and he was there from approximately 1:58 a.m.

19    until 3:54 a.m., and he was in the immediate area of a

20    Waffle House restaurant in Hendersonville, Tennessee, from

21    approximately 4:20 a.m. to 4:52 a.m. and he returned home at

22    5:00 o'clock in the morning on the 18th, and he was not

23    authorized to go to any other place other than his

24    employment on that date.

25         THE COURT:  All right.  But, again, it was --

1    unlike -- it was a situation where he was -- he may have

2    been authorized to work, but, again, only have to -- only

3    going home immediately after?

4            THE PROBATION OFFICER:  He was to return directly

5    home after work, and he did not.

6            THE COURT:  Right.  All right.  December 21?

7            THE PROBATION OFFICER:  On the 21st, he was in the

8    -- again, in the immediate area of Red Door Saloon located

9    on N Street -- N. 11th Street and Forrest Avenue in the Five

10   Points area of Nashville, Tennessee, from approximately 9:10

11   p.m. to 2:02 a.m. on the 22nd of December and returned home

12   to his residence at approximately 2:23 a.m. on the 22nd.

13   Again, he was not authorized to go to any other location

14   other than his place of employment on that date.

15           THE COURT:  All right.  And, again, that --

16           THE PROBATION OFFICER:  So he may have been able

17   to work after 9:00, but he had to go directly home --

18           THE COURT:  Right.  And the --

19           THE PROBATION OFFICER:  -- and he --

20           THE COURT:  Then --

21           THE PROBATION OFFICER:  -- did not.

22           THE COURT:  -- you -- the location monitoring from

23   9:10 to 2:02 in the evening doesn't have him -- he's not at

24   work during that period of time.  He's at a different

25   location?

```
1              THE PROBATION OFFICER:  Right.  He's down in the
2     area of a Red -- of a place called Red Door Saloon.
3              THE COURT:  All right.  December --
4              THE PROBATION OFFICER:  And then --
5              THE COURT:  -- 24th?
6              THE PROBATION OFFICER:  He was -- he left work at
7     approximately 1:06 a.m. and went to the area of 4th Avenue
8     and Jefferson Street in Downtown Nashville and he was there
9     from approximately 1:38 a.m. until 2:49 a.m. and returned
10    home at 3:08 a.m., and he was not authorized to go to any
11    other location other than his employment.  So even though he
12    got off at 1:06 in the morning, he was to go directly home,
13    and he failed to do so.
14             THE COURT:  And January 6th is -- I mean, January
15    2nd, as well?
16             THE PROBATION OFFICER:  And that one, he returned
17    to his residence at 11:12 p.m. on the 2nd.  And he was,
18    again, in the immediate area of Jonathan's Bar and Grille in
19    Indian Lake Boulevard in Henderson [sic], Tennessee, from
20    approximately 3:27 p.m. to 11:01, and he was -- and we did
21    not authorize him to be outside his residence --
22             THE COURT:  All right.  And that's --
23             THE PROBATION OFFICER:  -- after 9:00 p.m. on that
24    date.
25             THE COURT:  All right.  And, again, that's a --
```

 1   well, and that's another one.  So he's not working

 2   anywhere --

 3              THE PROBATION OFFICER:  Right.

 4              THE COURT:  -- from 3:30 in the afternoon to 11:00

 5   in the evening?

 6              THE PROBATION OFFICER:  Yeah.  Well, he -- yeah,

 7   he was not authorized to be out.  So he was not authorized

 8   to be out at all after 9:00 p.m.  That's what --

 9              THE COURT:  Right.  But the location where you

10   have him from 3:30 in the afternoon until 11:00 is not his

11   place of work?

12              THE PROBATION OFFICER:  No.

13              THE COURT:  All right.  And in -- on any of these

14   occasions, do you have any information that Mr. Pruitt

15   either in advance asked for some sort of extra dispensation

16   -- expert -- extra permission to be -- to go to places where

17   he wasn't authorized?

18              THE PROBATION OFFICER:  I do not have that

19   information, but that -- the officer put in there he was not

20   authorized.  That is -- that indicates that he was not given

21   permission in advance --

22              THE COURT:  All right.  And do you know whether --

23              THE PROBATION OFFICER:  -- because --

24              THE COURT:  And do you know whether -- at any of

25   -- on any of these occasions, did Mr. Pruitt contact the

 1   officer afterward to say, you know, that this had happened

 2   and to try to bring himself back into compliance?  Is there

 3   any information about that?

 4              THE PROBATION OFFICER:  He's in contact, but even

 5   if you were -- even if he was to contact afterwards, he

 6   still violated by doing it and not getting the authorization

 7   ahead of time.

 8              THE COURT:  Right.  No, no, I don't disagree --

 9              THE DEFENDANT:  Your Honor --

10              THE COURT:  I don't disagree --

11              THE DEFENDANT:  -- (inaudible) --

12              THE COURT:  -- with that, but -- I'm sorry.  I'm

13   sorry.

14              THE DEFENDANT:  Can I please --

15              THE COURT:  I'm sorry.  Mr. Pruitt, I've told you

16   once.  I'm not going to tell you again.

17              Ms. Schuck, can you continue.  So I --

18   Ms. Schuck --

19              THE PROBATION OFFICER:  Even if --

20              THE COURT:  -- I understand that doesn't mean he

21   doesn't -- he didn't violate.  But I mean, you -- do you

22   have any information one way or the other about whether

23   there was any follow-up afterward from Mr. Pruitt's --

24              THE PROBATION OFFICER:  On the 26th -- well, in

25   regards to -- he did contact -- he left a voicemail on

1    November 26th.  He acknowledged coming home late and

2    indicated it was not intentional.  So that's an example he

3    did contact afterwards, but, again, he was not authorized.

4         For December -- on December 11th, he left a

5    voicemail that he was coming home late because he didn't

6    have a ride home.  He took an Uber to a friend's work and

7    then got a ride from him -- from that individual.

8         So everything comes in afterwards and it's via

9    voicemail, but when you're on -- you're on a curfew, you

10   know it.  You -- it's explained to you.  You must go

11   directly home, not be -- not -- in constant violations.

12        THE COURT:  I -- that, I understand.  I just

13   wanted to know the full context of that.

14        All right.  Let me just see if I have any more

15   things that I was wondering about.  Ah, there was one other

16   thing I just want to make sure I understood, is when there's

17   -- and I think I know the answer -- but I have -- I see --

18   when Mr. Pruitt was originally arrested in this case, he was

19   facing three counts of violating a temporary protective

20   order in a D.C. Superior Court case.  In the violation

21   report, you say that he's now under CSOSA supervision in

22   that case or at least he was when that violation report was

23   filed.  Do you have -- I mean, I think I know.  But that

24   case was resolved via plea, is that right, or do you not

25   know --

1          THE PROBATION OFFICER:  I am looking --

2          THE COURT:  -- the answer?

3          THE PROBATION OFFICER:  -- to see exactly --

4          THE COURT:  That's --

5          THE PROBATION OFFICER:  I can find that answer.  I

6     just need a few minutes.

7          THE COURT:  All right.  Well, you can pipe up

8     later.  That's something I certainly can ask Mr. Jenkins or

9     the Government about, too.

10          All right.  Let me hear from you, Ms. Loeb, on

11    what the Government's request is.

12          Well, in summary, Ms. -- let -- before we -- I

13    pivot to the Government, Ms. Schuck, do you have anything

14    further to add?  And what is Pretrial's request?

15          THE PROBATION OFFICER:  Pretrial is requesting

16    that Mr. Pruitt be removed from all supervision programs.

17          THE COURT:  All right.  And do you have anything

18    further to add than what you have already?

19          THE PROBATION OFFICER:  Not at this moment.  As I

20    gather a little bit more information, I will make additional

21    representations.

22          THE COURT:  Okay.  Ms. Loeb, I will hear from the

23    Government on your motion.

24          MS. LOEB:  Thank you, Your Honor.

25          In his response, Mr. Pruitt says that the curfew

1    violations and the threats aren't really his fault and he

2    has excuses for them, but I think the problem here is that

3    we're at a point where Mr. Pruitt has abused the Court's

4    trust and it's very difficult to credit Mr. Pruitt's

5    statements.

6              We go back to January 6th, 2021, when Mr. Pruitt

7    breached the Capitol while he was on probation and pretrial

8    release, which was an enormous breach of trust in and of

9    itself, and then that night, the mayor put a curfew in

10   place, but Mr. Pruitt didn't follow that.  He was given an

11   order to disperse.  He didn't follow that either.  And he

12   was arrested that night, and he told the police that

13   basically he was just there to de-escalate the situation.

14   This is another statement from Mr. Pruitt that is hard to

15   credit when you see video of him hurling furniture across

16   the Capitol and confronting police officers.

17             During the past year, the Court has given him

18   additional chances to abide by a curfew, and Mr. Pruitt has

19   a criminal record and he has experience with being on

20   probation.  He knows what it means and what it requires to

21   comply and, unfortunately, he has repeatedly failed to

22   comply.  He's also been convicted of violating a civil

23   protective order which is another conviction that shows an

24   inability to follow the Court's rules.

25             THE COURT:  That -- Ms. Loeb, to -- not to

 1    interrupt you, but -- well, I guess I am interrupting you,

 2    but that's the case I was asking about before, the Superior

 3    Court case for which he was on supervised -- he was on

 4    pretrial release at the time of -- that he was arrested in

 5    this case; is that right?

 6              MS. LOEB:  That's right, Your Honor.

 7              THE COURT:  All right.  Sorry.  Continue.  Sorry.

 8              MS. LOEB:  And last week, the -- Mr. Pruitt's

 9    interview on CNN aired.  And on CNN, he said that he -- he's

10    concerned -- he fears the consequences of potentially having

11    to go to jail.  That statement -- even that statement seems

12    hard to credit because his actions, where he repeatedly

13    violates the terms of pretrial release knowing full well

14    that that is behavior that could end him up in jail, I --

15    even that statement seems difficult to trust here.

16              Even -- it's -- so turning to the issue of the

17    curfew violations, which Mr. Pruitt says aren't his fault,

18    there are a few problems.  I mean, he's had a year now to

19    sort it out and he hasn't been able to do so.  He just

20    hasn't been able to abide by the rules at this point.  We're

21    looking at seven violations in the most recent period, and

22    these violations involve being gone in the middle of the

23    night and they involve being gone for hours at a time.  It

24    just shows a lack of respect for the Court's authority.

25              His filing says that he hasn't been in any trouble

1    while he's been out.  I don't have evidence of him

2    committing criminal violations, but I will say that some of

3    the videos that he has posted appear to be taken at a bar,

4    and it also looks that several of his violations involve him

5    being near bars when he's supposed to be at home, and that

6    includes one of the videos that we cited in our memo where

7    he says, I've got 30 friends waiting for you.  You know who

8    makes a -- and he -- the -- it becomes clear that the 30

9    friends are bullets in a Glock.  And he says, You know who

10   makes a fuck -- a fucking extended clip with a 30 round in

11   it?  A Glock 19.  So that's a video that it appears that

12   Mr. Pruitt has filmed at a bar.  So we would dispute that

13   there is no evidence -- that he hasn't gotten into some

14   trouble when he's been out, but -- I mean, the underlying

15   problem, though, of course, isn't -- is that he -- is the

16   inability to follow the Court's rules no matter what the

17   excuse might be, given that he's had a year and multiple

18   chances to figure out how to do so.

19          Turning to the threats, which he also says aren't

20   his fault because he were provoked -- he was provoked, I

21   wanted to make a couple points.  First of all, the text

22   message chain that defendant submitted in his filing on Page

23   6, at the top of it, there appears to be a text message from

24   Josh that says, I'm going for his head.  Now, I'm -- I don't

25   know if there's another Josh in the conversation, but if

1    this is Mr. Pruitt, this is another example of some pretty

2    disturbing videos and messages that we've seen that we

3    excerpted in our memo.  And, again, given these breaches of

4    trust, it is just hard to take Mr. Pruitt at his word, and

5    it's dangerous to take him at his word when he says that,

6    you know, he didn't mean any of it.  And even if he was

7    provoked -- I mean, maybe, there are other people out there

8    who also threatened him.  They shouldn't be making threats

9    either.  But Mr. Pruitt, while he's on pretrial release, he

10   needs to take the steps to follow the rules, to follow the

11   law, and to not threaten back.  Those other cases, what

12   other people said to him, that's not before us.  What

13   matters here is Mr. Pruitt's conduct.  And it's -- I also --

14   I mean, one of the other videos, Mr. Pruitt said, You said I

15   threatened him.  I didn't threaten shit.  I promised it.

16   Again, when he's saying, No, these aren't just threats;

17   these are promises, it's dangerous for the Court to just

18   ignore all of the threats at this point.

19          When you look at, in the past, Mr. Pruitt has --

20   he violently stormed the Capitol, threw furniture around, he

21   confronted police, and then when he went on CNN, he said he

22   didn't see anything wrong with what he did.  I could

23   understand a dispute about some of the evidence, some of the

24   charges, but -- I mean, he couldn't even admit that throwing

25   a chair is a problem.  And if he is in a place where he

1    cannot recognize any wrongfulness and he is making threats,

2    then I think you -- we don't need to show danger here to

3    revoke Mr. Pruitt's release, but I think it's something that

4    the Court should consider that there could be, you know,

5    some serious costs to allowing Mr. Pruitt to remain on

6    release.

7              That is all I wanted to say.  And I'm happy to

8    answer any further questions that the Court might have.

9              THE COURT:  No, I don't have any at the moment.

10             Mr. Jenkins, let me hear from you.  I think, you

11   know, I -- you know because you've been here on every

12   occasion when Pretrial has come forward and said, We've got

13   a problem here, and I've, on repeated occasions, said to

14   you, Have you talked to Mr. Pruitt?  Does he understand it's

15   not -- the pretrial -- at least, conditions of release are

16   not, sort of, suggestions?  And I know you, on at least two

17   occasions, told me you talked with him.  He understood he --

18   the need to be in complete compliance.  This wasn't a joke.

19   And here we are.  So what say you, Mr. Jenkins?

20             And, look, I -- it's what's happened -- it's

21   what's been going on in this case and it's his history that

22   both precedes this -- initiation of this case and what has

23   happened subsequent to him being charged in this case; that

24   is, as Ms. Loeb mentioned, that he was -- pled guilty to

25   violating a civil protection order, and that's a Superior

1    Court case.  So why, on this whole record -- how can I

2    conclude that he is -- that he will likely obey his

3    conditions of release going forward?

4            MR. JENKINS:  Well, Your Honor, thank you.  May it

5    please the Court.  Again, Robert Jenkins on behalf of

6    Mr. Pruitt.

7            While I appreciate the Government's concern as

8    well as the questions posed by the Court, I think that the

9    overall purpose of the conditions of release were to

10   accomplish a couple of legitimate purposes.  One, to ensure

11   that he returns to court, which I think there's no evidence

12   to suggest that Mr. Pruitt has failed to abide by any

13   directions to appear, to participate in any proceedings

14   since his initial arrest; secondly, to ensure the safety of

15   the public.  And while these curfew violation allegations,

16   even if they are credited as being absent any excuse or

17   justification, I don't think they, in and of themselves,

18   should give rise to the Court being terribly concerned that

19   Mr. Pruitt is a threat to the community.  There's no

20   evidence that even if he did exactly what is alleged to have

21   been done in the pretrial services report, that during those

22   periods of time, he was out engaged in any dangerous

23   behavior, any threatening behavior to anyone.  Now, that --

24           THE COURT:  Well --

25           MR. JENKINS:  -- does not excuse --

1          THE COURT:  Hold on, Mr. Jenkins.  Let me just --

2    hold on one second.  Let me just say -- let me just

3    interrupt you here.

4          I don't know, you know -- I think it's fair --

5    when the Government -- the Government does have evidence

6    that while he's -- that he has at least engaged in violent

7    rhetoric; isn't that fair?  While he's been out --

8          MR. JENKINS:  That --

9          THE COURT:  And let me make clear, I don't know

10   the context of this -- these things, and I'm not -- I don't

11   need to to revoke him, and I don't think I can, sort of,

12   conclude he was in the wrong or he was in the right.  I

13   don't know and I'm not going to pretend to know.  But the

14   whole point of the curfew, it seems to me, from the start

15   was that Mr. Pruitt -- that there were, you know -- that

16   based on his prior history and based on the nature of the

17   allegations in this case, the whole point was to, sort of,

18   keep him in a place where things -- where there wouldn't be

19   a threat to the community.  And so when I've got these --

20   I've gotten now repeated -- repeated -- issues -- instances

21   of him not complying with his curfew, that coupled with --

22   again, I don't have to find he's right or wrong.  But isn't

23   it fair to say, though, that the Government is -- he hasn't

24   been charged with another crime.  I get that.  I don't --

25   and there's nothing -- and there's no -- nothing -- as

1    Ms. Loeb concedes, they're not accusing him of committing a

2    crime, but what they have put in front of me is, if not

3    fire, smoke, and the kind of smoke that we all hope to avoid

4    by imposing conditions of release like a curfew.

5              MR. JENKINS:  And I --

6              THE COURT:  So I -- isn't that fair?

7              MR. JENKINS:  It is fair, Your Honor.  And by --

8    but I don't want the Court to take from my earlier comments

9    that I concede that Mr. Pruitt being away from his residence

10   outside authorized periods of time are without any

11   justification or legitimate excuse, which I think the Court

12   should take into consideration in determining whether or not

13   those violations, in fact, were intentional and whether or

14   not they were willful.  I was only offering what I did to

15   suggest that even if we assume that that's the case, let's

16   take a look at them.  And is there any evidence that while

17   he was out for this 15 minutes past his curfew or 2 hours

18   and 12 minutes past his curfew -- is there any evidence that

19   he was engaged in dangerous conduct that placed himself,

20   others, the community at risk?  And I don't think that there

21   is.  That doesn't mean that his failure to strictly comply

22   isn't something that the Court should take a serious look

23   at.

24              And to that, I would add, Your Honor, what

25   Mr. Pruitt has attempted to -- albeit not necessarily

1    adhering to court norms, tried to explain directly to the
2    Court is that on the first occasion, he was trapped outside
3    of his home in a storm -- snowstorm doing the best he could
4    to try to get back in time for his curfew and he failed to
5    do so.  On the other occasions, Your Honor, for slightly
6    different reasons but basically resulting in the same,
7    Mr. Pruitt found himself -- he does not own an automobile;
8    does not have a driver's license; is dependent either -- on
9    Uber when he can afford to bear the cost of Uber.  More
10   often than not, he relies on friends and his immediate boss
11   or supervisor at one of the locations where he works at in
12   order to provide transportation.  Now, he knows it's his
13   responsibility and not theirs, but on, I think, what
14   Pretrial Services has told us and at least on five of the
15   seven occasions -- I may have lost count, so please forgive
16   me if I'm quoting the numbers being incorrect -- Mr. Pruitt
17   soon thereafter contacted Mr. Cooper, who is his supervising
18   officer down in Tennessee; advised him of why he was out of
19   town -- excuse me, out of place, and explained the
20   circumstances to him.  I think the Court inquired as to
21   whether or not Mr. Pruitt, in fact, had done that because it
22   found it to be relevant to determine whether or not this was
23   willful, intentional, just complete disregard for the
24   respect of the Court or not.  So I think he should be
25   credited with that, also.

 1              I won't belabor the point about the threats, you

 2      know?  Look, I mean, it's unfortunate in our society that we

 3      see a lot of this where people engage in this type of

 4      rhetoric over social media.  We tried to provide to the

 5      Court some examples -- clear examples where there's no

 6      question one or more individuals were threatening to find

 7      Mr. Pruitt and come to him and to assault him.  And

 8      Mr. Pruitt responded, maybe, not in the most mature fashion,

 9      but what his intent was was to try to deter anyone from

10      doing just that.

11              THE COURT:  Well --

12              MR. JENKINS:  So --

13              THE COURT:  -- Mr. Jenkins --

14              MR. JENKINS:  -- he said things in response.

15              THE COURT:  You know, you don't have to spend --

16      look, I'm not -- I don't need to and I don't think,

17      ultimately, it's that relevant, and I don't think there's

18      any way I could even come to a conclusion about, sort of,

19      who started what and who was at fault in any of these

20      exchanges, but the point is that it is exactly that kind of

21      environment that Mr. -- that the whole point of these

22      curfews were to keep Mr. Pruitt away from.

23              Let me just, then, follow up.  So throw out the

24      snowstorm issue for the moment.  The rest of them,

25      Mr. Jenkins, is it your contention that for the rest of

 1   those six instances here, we're talking about -- I mean,

 2   we're talking about a situation where Mr. Pruitt alleges

 3   that on each of those, he says, look, it was out of his

 4   control, he had no other way of getting home, and there was

 5   nothing he could do?

 6             MR. JENKINS:  Essentially, yes, Your Honor.

 7             THE COURT:  I mean --

 8             MR. JENKINS:  Yes.

 9             THE COURT:  -- on January 2nd, I have him, from

10   3:30 in the afternoon until 11:00 o'clock, at a place not at

11   his work.  I guess that's not a situation where he was

12   stranded -- first of all, I -- as you know, I think I have

13   to take into account your explanation here, obviously, but

14   at the end of the day, we've been through this time and time

15   again that it doesn't -- I mean, he understood the need to

16   be in compliance, and these were just -- I mean, and if he

17   can't get a ride home, then he can't go to work.  I mean,

18   that's the bottom line.  But apart from that, I guess what

19   I'm having trouble with is, I guess, a couple of things.

20   One is we're not talking about, you know, being 15 minutes

21   late or a half an hour late.  We're talking -- being --

22   coming -- getting home at, you know, 5:00 o'clock in the

23   morning; at 3:00 o'clock in the morning.  So that really, I

24   guess, calls somewhat into question that explanation, it

25   seems to me.  And then specifically, for example, on January

1    2nd -- I mean, it's 3:30 in the afternoon to 11:00 o'clock

2    at night.  He's at a bar or a restaurant where he's not

3    working.  So what's the explanation there?  I don't think

4    there's any -- I don't know of any work-related explanation

5    for that day.

6            MR. JENKINS:  Well, Your Honor, it's -- again, the

7    Court, I think, is familiar with the fact that Mr. Pruitt is

8    a bartender.  And on the prior occasion in which this matter

9    was brought to the Court, again, Mr. Pruitt was found to be

10   in or around bars during certain times outside of his

11   curfew.  And at that point in time, he explained to the

12   Court that he often is seeking new employment opportunities

13   at such locations.  And in this situation, that is what

14   occurred from --

15           THE COURT:  But, Mr. Jenkins, when -- exactly, and

16   the last time, it was made clear to him that he couldn't do

17   this.

18           MR. JENKINS:  I understand, Your Honor.

19           THE COURT:  Okay.  All right.  I mean, I hear --

20   so your -- the representation on the 2nd is that he was

21   interviewing for another job?

22           MR. JENKINS:  Yes, Your Honor.

23           THE COURT:  All right.  And is -- anything further

24   you want to -- any further representations you want to make

25   -- let me -- actually, before I, kind of, ask you to say

1    whatever you -- else you want to say about this, I want to

2    just make sure I know -- as I looked at his -- sort of, the

3    issues surrounding this, I have -- I just want to make sure

4    I'm not misunderstanding this.  I have him as having pled

5    guilty to two counts of violating a protective order in that

6    D.C. Superior case we're talking about after -- the case was

7    pending when this case came in and then he resolved it.  I

8    have him on release under HISP in that Superior Court case

9    at the time he was arrested in this case.  Also, on January

10   6th, I have him on probation for a DUI conviction in

11   Maryland, and also, on January 6th, I have him -- again,

12   when this case came in -- when he was arrested in this

13   case -- I have him with an outstanding warrant for violating

14   his probation in a case in Georgia.  Am I -- do I have that

15   waterfront correct, as far as you know?  And is there

16   anything else that you want to -- any other argument you

17   want to make here?

18            MR. JENKINS:  Your Honor, with respect to his

19   history with contacts with the criminal justice system, I

20   think the Court is accurate, and I don't have any further

21   arguments to offer.

22            THE COURT:  All right.  Anything further -- any

23   other further argument you want to make on this?  And do you

24   want Mr. Pruitt -- I mean, I guess the other question is, do

25   you want Mr. Pruitt to address me directly?

1              MR. JENKINS:  Your Honor, Mr. Pruitt has expressed

2     to me by way of texts that he would like to speak directly

3     to the Court, and I would yield to his wishes.

4              THE COURT:  All right.  Mr. Pruitt, just -- I'll

5     hear from you in one second.

6              Before I -- I just -- there's one thing that went

7     back and forth between Mr. Jenkins and Ms. Loeb that I just

8     want to get clarity on from Ms. Loeb.

9              Ms. Loeb, is the -- one of the text -- one of the

10    exchange -- I thought you said this, but I want to make sure

11    I'm not misunderstanding you.  Were you saying that at least

12    -- that there was some of the -- oh, how to put it -- some

13    of the, sort of, exchanges between Mr. Pruitt and other

14    people actually that you brought to my attention in your

15    filing, that some of them occurred during one of these

16    periods where he's alleged to have been violating his

17    conditions or -- I couldn't tell whether you were making

18    that assertion.

19             MS. LOEB:  No, Your Honor.  I'm not --

20             THE COURT:  All right.

21             MS. LOEB:  -- making that assertion.  My point was

22    just that it was at a bar and it -- there -- and that is --

23    and when Mr. Pruitt was violating curfew, he was often in

24    the area of bars and --

25             THE COURT:  Okay.

```
 1                    MS. LOEB:  -- nightclubs.  That's it.
 2                    THE COURT:  Understood.  All right.
 3                    Mr. Pruitt, let me hear from you, sir.
 4                    (Brief pause.)
 5                    THE DEFENDANT:  I'm trying to keep myself
 6           together.
 7                    (Brief pause.)
 8                    I'm sorry.  I went through hell over the last
 9           year, especially with these death threats and everything
10           else.  I've went -- I have went out multiple times trying to
11           find extra jobs and, you know, the same people that are
12           contacting the prosecutor are the one that got me fired from
13           my last bartending job; that they called and basically
14           threatened the bar if they didn't fire me.  Well, this is
15           what I'm dealing with.  I'm not -- I think -- January 2nd, I
16           think that was the snowstorm; that I went out at 3:00
17           o'clock to watch football, and I think that was the
18           snowstorm.  I'm trying to do things right.
19                    (Brief pause.)
20                    But I'm being attacked left and right.  I get
21           death threats all the time.  I mean, this is what I'm living
22           with right now.  I get lied about in the media, which I'm
23           already working with lawyers to work on that because they
24           lied about me in the media.  They said I hit a cop which is
25           not true.  I -- they said I bragged about hitting a cop.  I
```

```
1    didn't.  I bragged about stopping somebody from hitting a
2    cop, but I'm the bad person.  I haven't broken any laws in
3    the last year.  I haven't done anything.  I'm just trying to
4    live my life and take care of my kids.  That's it.
5              (Brief pause.)
6              MR. JENKINS:  Your Honor, I think that's all
7    Mr. Pruitt wanted the Court to know.
8              THE COURT:  All right.
9              (Brief pause.)
10             THE PROBATION OFFICER:  Your Honor --
11             THE COURT:  Yes, Ms. Schuck?
12             THE PROBATION OFFICER:  -- this is Pretrial
13   Services -- Christine Schuck, Pretrial Services.  We have
14   additional representations to make.
15             THE COURT:  Okay.
16             THE PROBATION OFFICER:  So Pretrial -- first, in
17   regards to Mr. Pruitt's record, he is on probation in two
18   cases for DUI, one in Georgia; one in Maryland.  In the
19   Georgia case, the warrant -- there is still a violation of
20   probation warrant that is still active.  It is not
21   extraditable from Washington, D.C.  But that warrant was
22   notated in the pretrial services report that was done for
23   his initial appearance.  The fact that it is still active
24   shows that he has not taken any steps to resolve that
25   violation of probation warrant.
```

1          Second, he is on probation in Maryland for DUI.

2     (Inaudible.)

3          THE COURT:  Right.

4          THE PROBATION OFFICER:  He failed to appear for a

5     violation of probation hearing on January 7th, and according

6     to Maryland court records, they have now issued a warrant

7     for his arrest.

8          So we now have two cases of DUI where he's on

9     probation and he is non-compliant in each case, plus our

10    case where he is non-compliant with the conditions of HISP.

11    So he is -- we're showing a pattern of not being amenable to

12    supervision, hence we are requesting removal from all

13    supervision programs.

14         THE COURT:  Well, I guess I --

15         THE PROBATION OFFICER:  And he did take the plea

16    in the, (inaudible) -- case.

17         THE COURT:  All right.  So -- okay.  He was -- the

18    January -- I think you said January 7th.  You're talking

19    about, basically, a -- just a few days ago?

20         THE PROBATION OFFICER:  He failed to appear for

21    another violation of probation hearing in another DUI case.

22         THE COURT:  Right.  In his Maryland case --

23         THE PROBATION OFFICER:  And he --

24         THE COURT:  In the --

25         THE PROBATION OFFICER:  When he --

1                    THE COURT:  -- Maryland -- sorry.  In the

2        Maryland --

3                    THE PROBATION OFFICER:  Yes.

4                    THE COURT:  -- case that he's on probation for?

5                    THE PROBATION OFFICER:  Yep, and they violated --

6                    THE DEFENDANT:  Which I have no knowledge of.

7                    THE PROBATION OFFICER:  -- (inaudible) -- and

8        he --

9                    THE COURT:  Okay.

10                   THE PROBATION OFFICER:  And he failed to appear --

11                   THE DEFENDANT:  I have no knowledge of that --

12                   THE PROBATION OFFICER:  -- and now they've issued

13       a warrant.

14                   THE COURT:  All right.  Let me --

15                   THE DEFENDANT:  I have no knowledge of that.

16                   THE COURT:  All right, Mr. Pruitt.

17                   Let me just ask, also, Mr. Jenkins.  I should have

18       asked you this directly before.  There's this -- I, you know

19       -- it's something I think I do have to consider.  The

20       statements that Ms. -- that the Government has raised with

21       regard to CNN that -- the CNN interview or whatnot where

22       they say that -- where Mr. Pruitt, sort of, says -- I guess,

23       suggests that he might do what he's accused of in this case

24       again and that he really -- didn't really think he did

25       anything wrong, Mr. Jenkins --

```
 1                    THE DEFENDANT:  (Inaudible.)
 2                    THE COURT:  -- Mr. Jenkins, do you --
 3                    THE DEFENDANT:  (Inaudible.)
 4                    THE COURT:  Mr. Pruitt, hold on one second.
 5                    THE DEFENDANT:  He'd --
 6                    THE COURT:  Mr. Pruitt, hold on one second.
 7                    Mr. Jenkins, do you want --
 8                    THE DEFENDANT:  I'm sorry, Your Honor.
 9                    THE COURT:  -- to address --
10                    MR. JENKINS:  Yes, Your Honor.
11                    THE COURT:  Do you want to --
12                    MR. JENKINS:  Yes, Your Honor.
13                    THE COURT:  Do you, in the first instance, want to
14        address those statements or let Mr. --
15                    MR. JENKINS:  Yes.
16                    THE COURT:  -- Pruitt address them.
17                    MR. JENKINS:  Yes, Your Honor.  I certainly want
18        to address them, Your Honor, and apologize for failing to do
19        so earlier.
20                    THE COURT:  No, I had it on my list to ask you
21        about and I forgot.
22                    MR. JENKINS:  Yes, Your Honor.
23                    Your Honor, with respect to the CNN interview,
24        what Mr. Pruitt has relayed to counsel is that -- and this
25        certainly is something that I find to be credible -- that
```

1    the complete statement that he made in response to the

2    interviewer's question was not actually aired and included.

3    We have -- what Mr. Pruitt was referring to was the fact

4    that he would go to the Capitol again; that he had -- that

5    he saw nothing wrong with going to the Capitol and doing

6    what he believed was simply exercising his First Amendment

7    right.  The way that the question was asked and the answer

8    that he's given, given how the images -- the video that was

9    placed up, it gave the appearance that he was saying --

10                  (Brief pause.)

11                  THE COURT:  Oh, no.

12                  THE DEPUTY CLERK:  We've lost Mr. Jenkins.

13                  THE COURT:  It appears we've lost Mr. Jenkins.

14                  THE DEPUTY CLERK:  He'll pop back in.

15                  THE COURT:  Let's -- we'll give him a moment to

16    rejoin us, especially since he was right in the middle of

17    making an important point.

18                  (Brief pause.)

19                  MR. JENKINS:  I apologize, Your Honor.  I'm trying

20    to get my video on.

21                  THE COURT:  It's not your fault, Mr. Jenkins.

22    Take a moment.

23                  (Brief pause.)

24                  MR. JENKINS:  Yes, Your Honor.  If I may continue,

25    what Mr. Pruitt was trying to explain is that the act of

1    going to the Capitol, the act of doing what he considered

2    nothing more than exercising his First Amendment right, that

3    he doesn't regret doing that, but, again, the way the video

4    was aired, it gave the impression that he was saying the

5    breaching of the Capitol, the conduct that was depicted in

6    the video of Mr. Pruitt apparently engaged in throwing a

7    piece of furniture inside of the Capitol, as well as his

8    verbal confrontation with law enforcement inside of the

9    Capitol were not regrettable behavior.  That's not what he

10   intended to convey.  His intent was to merely suggest that

11   he saw nothing wrong with the idea of going to the Capitol

12   to let his views be known to his elected officials

13   concerning the election; that there was nothing wrong with

14   that.

15              THE COURT:  Well, Mr. Jenkins, let me say this.

16   There -- it wouldn't be the first time that CNN took

17   something out of context and didn't portray something

18   accurately.  I'll just --

19              MR. JENKINS:  Yeah.

20              THE COURT:  -- say that.  But I mean, the

21   statement I have in front of me is -- or -- and I won't even

22   -- let me just also add, whether it's CNN or any other media

23   outlet, media outlets, one -- for one reason or another,

24   don't always report things accurately, clearly.  But the

25   statement I have -- and I've -- I just read what the

 1    Government filed here, but it does say -- the quote that is

 2    in what the Government has represented is, you know -- he

 3    says he would do it again, but, you know -- he thinks he

 4    would do it again but that he wasn't sure because of the

 5    consequences he faces here.  That, sort of -- that further

 6    context does seem to suggest, sort of --

 7                    MR. JENKINS:  No --

 8                    THE COURT:  -- his -- I mean --

 9                    THE DEFENDANT:  Your Honor, I would -- I --

10                    MR. JENKINS:  Mr. --

11                    THE DEFENDANT:  Your Honor, I would ask --

12                    THE COURT:  Mr. Pruitt --

13                    THE DEFENDANT:  (Inaudible.)

14                    THE COURT:  Mr. Pruitt, you're going to have an

15    opportunity.  You're going to have an opportunity.  Okay?

16    But that --

17                    THE DEFENDANT:  Okay.

18                    THE COURT:  -- doesn't --

19                    THE DEFENDANT:  I'm sorry.

20                    THE COURT:  -- that doesn't -- I guess you

21    wouldn't link it to all of this if it were just peaceful

22    protesting at the Capitol.  He obviously wouldn't have been

23    -- he wouldn't -- he's not charged with peaceful protesting.

24    So the fact that he links it to, (inaudible) -- punishment

25    he may have in this case, isn't that -- doesn't that suggest

1    that he's talking about just the sum total of what he was

2    doing that day?

3              MR. JENKINS:  No, no, no, Your Honor.  I think

4    that's taking it too far.  Mr. Pruitt, as I've heard from

5    others charged in relation to January 6th, didn't appreciate

6    the gravity of their conduct until after January 6th.  I'm

7    sure the Court is also familiar, because I know you have a

8    number of these cases, where some of these defendants are

9    quite surprised that the mere fact of walking into the

10   Capitol was somehow a violation of the law.  Well,

11   Mr. Pruitt has a better understanding of where the lines are

12   drawn today than what he did back on January the 6th.  So

13   Mr. Pruitt says to the interviewer, Hey, look, now that I've

14   got an appreciation of what the consequences were, I mean, I

15   don't know, because I don't know if I would want to assume

16   these types of consequences from doing what I thought that

17   day was exercising my First Amendment right and perhaps

18   walking into a government building, which, you know,

19   Mr. Pruitt and others would maintain they thought was a

20   public building and it was not a violation of the law to

21   simply walk into the building.  That's what he was saying.

22   But, again, the way it was portrayed in the interview

23   suggested that he meant he had no regrets for the

24   confrontation with law enforcement -- the verbal, that is --

25   or anything else that was -- that occurred inside.  That's

1    not what he meant.  He --

2              THE COURT:  Mr. --

3              MR. JENKINS:  -- now knows.

4              THE COURT:  Mr. Jenkins, do you mind -- do you --

5    Mr. Pruitt, obviously, wants to address --

6              MR. JENKINS:  Yes, Your Honor.

7              THE COURT:  -- this point, too.  So I'll -- I

8    appreciate your argument.

9              Mr. Pruitt, let me hear from you, sir.

10             THE DEFENDANT:  Well, I mean, Your Honor, if you

11   subpoenaed that whole actual, like, interview, I actually --

12   I said straight up that I regret going inside.  I effed up

13   when I did that.  It was a mistake and it was stupid.  Okay?

14   I regret doing that.  And I regret a lot of the things that

15   I saw inside that building.  And the funny thing is there's

16   18,000 hours of video.  Where's the video of that cop,

17   (inaudible) -- me for not letting somebody hit them?

18   Where's that video?  I tried to help when I got inside

19   because I was disgusted with what I saw, but I'm the bad

20   guy.  I walked into an open front door.  And if I would have

21   came through that front door and a cop would have said, You

22   can't come in, I would have turned around.

23             MR. JENKINS:  Mr. Pruitt --

24             THE DEFENDANT:  (Inaudible.)

25             MR. JENKINS:  -- I -- Mr. Pruitt, I think you've

1    addressed the Court's concern about the actual interview.

2    If you're going to respond to the Court, can you please

3    limit your statements to the interview.

4              THE DEFENDANT:  The interview is just not -- they,

5    (inaudible) -- do a, (inaudible) -- they put six minutes of

6    how they wanted everybody to -- (inaudible.)  I mean, that's

7    the bottom line.  (Inaudible) -- they did with the last

8    interview I did with them, too.  They took an hour,

9    (inaudible) -- whole interview and they, (inaudible) -- six

10   minutes' worth of it, you know, to fit their narrative.

11             THE COURT:  All right.  Ms. Loeb, do you have

12   anything -- let me -- it's your motion.  So let me give you

13   the last word in terms of argument.

14             MS. LOEB:  Your Honor, Mr. Jenkins referred to

15   threats on social media and suggested that threats on social

16   media are just idle threats.  I wanted to point out that on

17   January 5th, Mr. Pruitt posted a video on Parler where he

18   says, essentially, You've messed with the wrong fucking

19   patriot.  The morning of January 6th, he sends a photo of

20   himself with -- or posts a photo of himself with a gun on

21   social media.  And then what does he do?  He storms the

22   Capitol that day.  So I don't think, with Mr. Pruitt, we can

23   just say this is just social media and he's not going to act

24   on any of the things he posts.  And I would agree with Your

25   Honor's points about what is suggested by the references to

```
 1   punishment in the CNN interview.  And the Government also

 2   quoted an earlier CNN reporting where Mr. Pruitt himself

 3   posted that he didn't regret anything about January 6th.

 4   And Mr. Pruitt entered the Capitol as -- just when the

 5   Senate wing door was breached as the windows were being

 6   broken.  So the idea that this is someone who just strolled

 7   in and thought he was exercising his First Amendment rights

 8   is not credible.

 9            THE COURT:  All right.  Very well.

10            After considering the Government's motion --

11            THE DEFENDANT:  Okay.  So -- no, no.  So first of

12   all, I didn't break the windows.  Second of all, if I wanted

13   to plan an insurrection, do you not think I wouldn't have

14   walked in with that AR-15 I took a picture with --

15            THE COURT:  Mr. Pruitt --

16            THE DEFENDANT:  -- or the bulletproof vest if

17   someone --

18            THE COURT:  Mr. Pruitt, I've heard from you

19   already.

20            THE DEFENDANT:  I'm sorry, Your Honor.  I just am

21   trying to prove a point.

22            THE COURT:  After considering the Government's

23   motion to revoke, Mr. Pruitt's opposition, and the evidence

24   that's been presented, the arguments of the parties, and the

25   standard set forth in 18 United States Code 3148, I am going
```

1      to revoke Mr. Pruitt's pretrial release and order him

2      detained pending trial.  And I'm going to explain why I'm

3      doing that here, and I don't do it lightly.

4            Mr. Pruitt is charged with eight offenses for his

5      conduct on January 6th, 2021, including several serious

6      felonies.  The superseding indictment, ECF No. 30, reflects

7      the following offenses:

8            Obstruction -- obstructing a law enforcement

9      officer during a civil disorder, in violation of 18 United

10     States Code Section 231(a)(3); obstructing an official

11     proceeding, in violation of 18 United States Code Section

12     1512(c)(2); destroying property -- government property, in

13     violation of 18 United States Code Section 1361; entering

14     and remaining in a restricted building on -- or grounds, in

15     violation of 18 United States Code Section 1752(a)(1);

16     engaging in disorderly and disruptive conduct in a

17     restricted building or grounds, in violation of 18 United

18     States Code Section 752(a)(2) [sic]; and engaging in

19     physical violence in a restricted building or grounds, in

20     violation of 18 United States Code 1752(a)(4); engaging in

21     violent -- disorderly conduct in a Capitol building, in

22     violation of 40 United States Code Section 5104(e)(2)(D);

23     and engaging in an act of physical violence within the

24     United States Capitol grounds or a Capitol building, in

25     violation of 40 United States Code Section 5104(e)(2)(F).

1          The 1512(c)(2) offense is one for which the

2     maximum term of imprisonment is 20 years.  So it's a serious

3     offense.

4          The Government alleges in its motion that

5     Mr. Pruitt entered the U.S. Capitol -- in its motion; this

6     is not spelled out in the charging document -- but the

7     Government alleges in its motion that Mr. Pruitt entered the

8     U.S. Capitol on January 6th, 2021, shortly after the initial

9     breach.  Once inside, it alleges that he damaged property by

10    throwing a "Quiet Please" sign across an atrium inside the

11    Capitol and throwing a chair across a room in the Capitol

12    Visitors' Center.  He -- they allege that he also confronted

13    Capitol Police officers and, in his own words, dropped an

14    officer who came at him.  Mr. Pruitt, today, has disputed,

15    sort of --

16              THE DEFENDANT:  You know what?

17              THE COURT:  -- dispute --

18              THE DEFENDANT:  I -- first of all --

19              THE COURT:  -- disputed that he --

20              THE DEFENDANT:  -- I didn't --

21              THE COURT:  -- said that --

22              THE DEFENDANT:  -- drop an officer.

23              THE COURT:  -- or -- Mr. --

24              THE DEFENDANT:  That's a lie.

25              THE COURT:  Mr. Pruitt, I did not recognize you to

1      speak.

2              Mr. Pruitt, as I said, for the record, has

3      certainly disputed that he said those words and disputed

4      that he attacked a police officer in a violent way.  He

5      disputes that.

6              THE DEFENDANT:  No, I didn't.

7              THE COURT:  Mr. Pruitt was arrested later on

8      January 6th, 2021, well -- when, according to the affidavit

9      accompanying the criminal complaint, law enforcement found

10     him out at about 9:20 p.m. past the 6:00 o'clock p.m. curfew

11     imposed by Mayor Bowser and he refused orders to disperse.

12     He had his initial appearance the next day.  And at that

13     initial appearance, Judge Harvey released him on several

14     conditions into the High Intensity Supervision Program.  And

15     that's ECF No. 11 in this case.  One of the conditions was

16     the curfew restricting Mr. Pruitt to his residence every day

17     from 10:00 p.m. to 6:00 a.m.  And at that time, Mr. Pruitt

18     was warned that if he violated any of his conditions of

19     release, he could -- his release could be revoked and he

20     could be detained.

21              And less than three weeks later, Pretrial Services

22     reported to me that Mr. Pruitt had multiple curfew

23     infractions since his release, the first one occurring a

24     mere nine days after his initial appearance.  That's ECF No.

25     6.  At least on one occasion at that time, he was alleged to

1  have remained outside his residence until the next morning

2  at almost 7:00 o'clock a.m. -- in the morning.

3        In light of that report, during the February 11th

4  proceeding before me, I asked Mr. Pruitt's counsel for

5  assurance that Mr. Pruitt understood that he had to strictly

6  comply with his conditions of release.  Counsel assured me

7  that he had spoken with Mr. Pruitt about the need to be in

8  complete compliance and that Mr. Pruitt understood that.  I

9  warned Mr. Pruitt that I would keep a close eye on whether

10  he strictly complied moving forward.

11        In March, Pretrial Services reported that

12  Mr. Pruitt had additional curfew infractions in March.

13  That's ECF No. 9.  And then, during an April 8th, 2021

14  status conference, I decided to adjust Mr. Pruitt's curfew

15  and make it 9:00 p.m. every night instead of 10:00 p.m. in

16  part because of the problems he had been having.

17        In early June, Pretrial Services reported that

18  Mr. Pruitt had complied with his curfew since the April

19  proceeding.  We're now at ECF No. 15.  But then, in August,

20  Pretrial Services reported that Mr. Pruitt committed several

21  additional curfew infractions in July and then in August.

22  That's ECF No. 17.  On two of those occasions, Mr. Pruitt

23  was out past 2:00 o'clock in the morning the following

24  morning.  And during the August 4th status conference,

25  counsel for Mr. Pruitt, again, explained that he -- oh, I --

1      explained to me that Mr. Pruitt violated his curfew because

2      he had been at job interviews for bartender jobs.   I

3      emphasized to Mr. Pruitt at that time that he had to comply

4      with his curfew and that, while he could work past his

5      curfew, he had to get permission beforehand with Pretrial

6      Services to do so.   And counsel, then, assured me that

7      Mr. Pruitt understood he could not violate his curfew for

8      any reason, including pursuing employment opportunities.

9              In October, Pretrial Services reported that

10     Mr. Pruitt had complied with his curfew since the August

11     hearing and that it had modified his curfew hours to

12     accommodate his employment schedule.   That's ECF No. 26.

13     But now, on January 4th of this year, Pretrial Services

14     reported that, since November, Mr. Pruitt has violated his

15     curfew at least six times.   That's ECF No. 32.   And the

16     Government has moved to revoke Mr. Pruitt's pretrial

17     release.

18              Under 18 United States Code Section 3148(b), I am

19     required to enter an order of revocation and detention if,

20     after a hearing, I find two things.   First, as relevant

21     here, I must find by clear and convincing evidence that

22     Mr. Pruitt has violated a condition of release.   That's 18

23     United States Code Section 3148(b)(1)(B).   And, second, I

24     must find either, (A), that based on the factors in 18

25     United States Code Section 3142(g), there is no condition or

1    combination of conditions that will assure that Mr. Pruitt

2    will not flee or pose a danger to the safety of any other

3    person or the community; or, (B), that Mr. Pruitt is

4    unlikely to abide by any condition or combination of

5    conditions of release.

6         I note that, unlike with the first finding, the

7    second finding the statute lays out does not specify the

8    standard of proof that applies.  But both the Second and

9    Fifth Circuits have squarely held -- have held squarely that

10   the standard of proof for this finding is a preponderance of

11   the evidence.  That's United States v. Gotti, 794 F.2d 773

12   at 777, a Second Circuit case from 1986; and United States

13   v. Aron, 904 F.2d 221 at 224, a Fifth Circuit case from

14   1990.  And although the D.C. Circuit's opinion in United

15   States v. Vortis is not entirely on point, its reasoning

16   supports applying the preponderance standard here.  That's

17   785 F.2d 327 at 328 through 329.  It's a D.C. Circuit case

18   from 1986.  So I will apply the preponderance standard for

19   this finding.

20        On the first point, I do find by clear and

21   convincing evidence that Mr. Pruitt has violated his curfew,

22   which is one of his conditions of release, on the occasions

23   in November, December, and January, and identified by

24   Pretrial Services and backed up on the record here by the

25   underlying GPS data that they have submitted.  For the

1   reasons I'll explain in a moment, I don't find his

2   explanations that these were situations beyond Mr. Pruitt's

3   control credible.

4         On the second point -- turning to the second

5   point, which is the more important point in a way, I do find

6   by a preponderance of the evidence that Mr. Pruitt is

7   unlikely to abide by any condition or combination of

8   conditions of release.

9         And I come to that conclusion for several reasons.

10        First, there is a -- the -- his history of

11  Pretrial advising me that Mr. Pruitt violated his curfew in

12  this case to date and the number of times that I have

13  admonished him about complying.  I just went through that

14  history.  I'm not going to repeat it all now.  But I've

15  given Mr. Pruitt far more opportunities to show that he can

16  comply than many judges in this courthouse would have.  But

17  he has chosen, once -- one way or another, again and again

18  to violate those conditions.

19        Second, we have the nature of what he's -- of

20  these violations and the explanation for the violations in

21  November through January.

22        First, I'll just say, these aren't ticky-tack

23  violations.  They're pretty significant violations.  His

24  curfew was at 9:00 o'clock.  And while he had permission to

25  work past then, he didn't have permission to be out at all

1    hours of the night.  And these violations include being out

2    until 2:30 a.m., 3:00 o'clock a.m., and 5:00 o'clock a.m.

3    So we're not talking about ticky- -- sort of, ticky-tack

4    violations.  And there's at least one of these -- and on at

5    least one of these occasions, again, we're talking about --

6    and numerous ones -- numerous -- on a number of these -- in

7    a number of these instances, we're talking about far late

8    into the evening.  And other times, we're talking about --

9    on January 2nd, we're talking about being -- at 3:00 -- from

10   3:27 in the afternoon to 11:00 o'clock at night.  At no

11   point during that time was Mr. Pruitt anywhere near work and

12   he just didn't come back.  I think there's been some dispute

13   one way or the other about whether there was a snowstorm

14   either on the 2nd or the 25th.  I think Mr. Jenkins thought

15   it -- represented it was the 25th; Mr. Pruitt, I think, said

16   it might have been the 2nd.  But either way, that -- again,

17   that's something that, if there's a snowstorm, you know

18   one's coming, you know you have a curfew, and it shouldn't

19   have been that hard to navigate to make it home.

20          So I think these are pretty striking -- the record

21   here is a pretty striking series of violations.  And I

22   simply don't find credible Mr. Pruitt's explanation that

23   these were all situations beyond his control.  I don't

24   believe it at all, and that lack of credibility is a key

25   reason for my ruling.  I don't find it credible because

1  we've been -- he's been before me multiple times in which

2  we've -- I've made it super clear that you don't get --

3  the -- my -- that the -- his conditions of release aren't

4  suggestions.  They're actually things that he's absolutely

5  required to comply with.  And I just don't believe that he

6  repeatedly is out there in the middle of the night for

7  reasons that are beyond his control.  As Mr. Jenkins

8  mentioned, there's -- for example, he -- there -- Uber

9  exists and Uber is a way to get home on time.  I understand

10 Uber can be expensive, absolutely, but it exists.  And I

11 don't believe on these occasions that what was happening

12 here was beyond Mr. Pruitt's control.

13        So beyond, number one, his history in the case

14 before the recent violations; number two, we have the

15 violations themselves and the incredibility of the

16 explanation offered for them; third, I have Mr. Pruitt's

17 criminal history, which is so replete with evidence of his

18 unwillingness to comply with lawful orders, including

19 conditions of release, it's almost hard to know where to

20 begin.

21        As I mentioned earlier, Mr. Pruitt was arrested in

22 this case initially for allegedly failing to comply with

23 Mayor Bowser's curfew order, even if he isn't charged with

24 that now.  And at that time, he was allegedly -- he

25 allegedly committed the crimes at issue in this case.  At

1    that time -- at the -- that -- at that time -- that is, the

2    time he allegedly committed the crimes at issue here -- he

3    was, one, on pretrial release in the Superior Court case

4    that we've talked about -- in fact, he was on the High

5    Intensity Program -- he was, two, on probation for a DUI

6    conviction in Maryland; and, three, he had an outstanding

7    warrant for his arrest for violating probation in a Georgia

8    case.  And now, Ms. Schuck informs us that as to the

9    Maryland conviction, he failed to appear for a hearing on

10   that just a few days ago, as we mentioned.  And Mr. Pruitt

11   eventually pled guilty in the Superior Court case, and in

12   doing so, he admitted violating a court order in that case.

13   So that's third, Mr. -- those series of things that make up

14   Mr. Pruitt's criminal history.

15          And, fourth, I have Mr. Pruitt's more recent

16   statements.  The Government brings to my attention an

17   interview that Mr. Pruitt gave CNN in which he is alleged to

18   have said recently that he'd likely do it again, referring

19   to his alleged actions on January 6th.  And he added that he

20   didn't feel he did anything wrong.  Of course, one of

21   Mr. Pruitt's conditions of pretrial release requires him not

22   to violate state, federal, or local law while on release.

23   So this is a troubling statement, to say the least.  Now,

24   granted, Mr. Pruitt's statement wasn't unequivocal.  He

25   hedged a little by noting that he wasn't sure if he'd do it

1    again, given the consequences he potentially faces in this

2    case because of his actions.  But even so, I think his

3    statement is pretty close to him suggesting that he has no

4    particular interest in following the law or my orders,

5    especially if he can get away with it, and it's certainly

6    consistent with his conduct so far in this case.  So it's

7    one more data point, along with all the other data points I

8    mentioned, from which I can conclude to a preponderance of

9    the evidence that Mr. Pruitt is unlikely to comply with his

10   conditions of release.

11        And I'll just add, I hear both Mr. Pruitt and,

12   Mr. Jenkins, your arguments that this is a statement taken

13   out of context.  And, look, I think that may -- I think I

14   have to weigh that.  And so I don't weigh -- this isn't --

15   certainly, my decision today doesn't turn on this, although

16   I think it's something that weighs against him.  It may well

17   be that it's out of context, but surely the quotes in the

18   Government's motion that are pulled there don't suggest,

19   Mr. Jenkins, the interpret- -- the generous interpretation

20   you would give to them.  And I think, you know, I have to

21   weigh that in what I'm doing here.

22        I'll also just mention -- I think I have to

23   mention here that the Government has put forth a bunch of

24   evidence about, sort of, conduct -- that Mr. Pruitt has

25   allegedly engaged in, sort of, threatening conduct back and

1    forth with other people.  I don't -- I -- as I said before,

2    I'm not -- I don't attribute wrongdoing in any way to

3    Mr. Pruitt on any of those occasions in the sense that I

4    can't know who started what, who threatened who first, and

5    the like.  That's not something I can come to a conclusion

6    on one way or the other.  But I do weigh that information in

7    this sense; that it -- keeping Mr. Pruitt -- keeping the

8    community safe was one of the bases for the curfew.  And

9    when that kind of conduct is alleged to have occurred, for

10   example, when Mr. Pruitt is out at a bar, it just only

11   underscores the need for Mr. Pruitt to have complied with

12   his conditions of release rather than, sort of, taking them

13   under advisement but not taking them seriously as he should

14   have had -- as he should have.

15          So in summary, his recent statements and conduct,

16   and particularly his pattern of disobeying lawful orders

17   from this Court, from other courts, lead me to believe that

18   he just can't be trusted to comply with my directives.  And

19   so I do find by a preponderance of the evidence that he's

20   unlikely to abide by any condition or combination of

21   conditions of release.

22          I want to address a couple of other arguments

23   that, Mr. Jenkins, you made in particular on paper.

24          Mr. Pruitt suggested in his opposition that I have

25   to consider the factors under 18 United States Code 3142(g)

1    in deciding this matter.  And, obviously, there's another

2    port -- another part of the statute that, if I had revoked

3    him under that part, I would have.  But I'm deciding to

4    revoke Mr. Pruitt under 18 United States Code 3148(b)(1)(B)

5    and (b)(2)(B).  And so unlike (b)(2)(A), neither (b)(1)(B)

6    nor (b)(2)(B) makes applicable the 3142(g) factors to my

7    analysis.

8            And the other point, Mr. Jenkins, that you made on

9    paper -- and you pointed out that Mr. Pruitt has been

10   compliant with many of his pretrial release conditions

11   without incident.  And I think I have to consider that and

12   weigh that.  But that doesn't prevent me from finding that

13   he's unlikely to abide by any condition or combination of

14   conditions of release under 3148(b)(2)(B).  And I'll point

15   to, just as an example, in the poor -- in the Paul Manafort

16   case, the D.C. Circuit affirmed a revocation order that

17   rested on a finding under 3148(b)(2)(B) that the defendant

18   could not be trusted to comply with the court's directives

19   with respect to any conditions of release, even though the

20   defendant was under various conditions that he apparently

21   complied with except one which was the violation that gave

22   rise to the revocation.  That's United States v. Manafort,

23   897 F.3d 340.  It's a D.C. Circuit case from 2018.  And in

24   another case -- a District Court case -- Judge Bates revoked

25   a defendant's pretrial release based on his repeated

 1    violations of one his -- of one of his conditions of release

 2    prohibiting him from using illegal drugs, even though the

 3    defendant in that case was under several other conditions

 4    that it appears he complied with largely without incident.

 5    That's United States v. Koumbairia.  It's 2007 WL 1307909, a

 6    D.D.C. case from May 3rd, 2007.  So simply put, whether a

 7    defendant has violated one or multiple conditions, what

 8    matters is whether a preponderance of the evidence shows

 9    that the defendant is unlikely to abide by any conditions of

10    release.  And for the reasons I've given, I find that to be

11    the case here.

12            Let me -- and so for these reasons, I will enter

13    an order later today revoking Mr. Pruitt's release and

14    ordering he -- that he be detained pending trial in this

15    case.

16            Let me ask Ms. Schuck.  Ms. Schuck, should I just

17    say in the order -- is it your recommendation that I simply

18    say that he report as directed by Pretrial Services and

19    perhaps just say by a time and date certain?

20            THE PROBATION OFFICER:  If he is -- in regards to

21    -- I apologize, Your Honor.  Since his conditions are being

22    revoked, the -- is the Court ordering him to

23    self-surrender --

24            THE COURT:  Yes.  I mean --

25            THE PROBATION OFFICER:  -- to --

1          THE COURT:  -- yes.

2          THE PROBATION OFFICER:  Okay.  So in --

3          THE COURT:  So that's --

4          THE PROBATION OFFICER:  -- the order -- the order

5     needs to state that he has to self-surrender.  And I would

6     specify a date you would like him to self-surrender.  And he

7     can self-surrender to the United States Marshals Service in

8     the local courthouse in the Middle District -- local federal

9     courthouse for the Middle District of Tennessee.

10         THE COURT:  Well, isn't that -- I mean, isn't that

11    something that Pretrial Services can give him very specific

12    directions for?

13         THE PROBATION OFFICER:  We can provide, like, the

14    address and all that, but in the order, we need it to state

15    that he's to self-surrender.

16         THE COURT:  Well, okay.  I understand.  It can say

17    self-surrender, but -- all right.  I'll just -- I'm going to

18    say self-surrender to the United States Marshals at the

19    direction of Pretrial Services.

20         THE PROBATION OFFICER:  We would respectfully

21    suggest tomorrow by noon, if --

22         THE COURT:  Right.

23         THE PROBATION OFFICER:  -- to Your Honor as far as

24    specifying a date.

25         THE COURT:  I understand that.

1          Let me ask Ms. Loeb about that question.  What's

2     your -- Ms. Loeb, what's your view on the timing?

3          MS. LOEB:  Your Honor, we -- I don't think we have

4     a strong view on the timing.  Of course, since we moved to

5     revoke, we believe that it's -- that Mr. Pruitt should be

6     detained soon, but I also understand if he needs more than a

7     day to wrap up his affairs in Tennessee.  So if he wants a

8     little bit more time, I wouldn't be opposed to that.

9          THE COURT:  Mr. Jenkins, what's your view on that

10    question?

11          MR. JENKINS:  Your Honor, I know Mr. Pruitt would

12    appreciate as much time as the Court is willing to afford

13    him in order to, as the Government says, wrap up his affairs

14    in Tennessee.

15          THE COURT:  What -- Mr. Jenkins, what -- he

16    mentioned earlier -- he -- his children.  Does he -- he --

17    they're not -- they -- he does not have --

18          MR. JENKINS:  No --

19          THE COURT:  He --

20          MR. JENKINS:  -- he does not have -- no, Your

21    Honor.

22          THE COURT:  Go ahead.  He --

23          MR. JENKINS:  He does not have custody of his

24    children.

25          THE COURT:  All right.  Hmm.  All right.  Let me

```
 1      -- Ms. Schuck --
 2              All right.  Well, let me do this.  I'm going to
 3      give him until Tuesday at 2:00 o'clock to surrender.  And
 4      let me just say this.  He -- his conditions of release,
 5      obviously, will remain in effect until he reports.  And
 6      so --
 7              (Technological interruption.)
 8              THE COURT:  -- obviously, may have to go --
 9              THE COURT REPORTER:  Oh --
10              THE COURT:  -- by that --
11              THE COURT REPORTER:  -- Judge Kelly, I'm sorry.
12              THE COURT:  Yes?
13              THE COURT REPORTER:  The Zoom froze.  I can tell
14      you the last thing I heard from you.
15              THE COURT:  Oh, all right.  Go ahead.
16              THE COURT REPORTER:  Yeah.  You were saying, His
17      conditions of release, obviously, will remain in effect
18      until he reports, and so --
19              THE COURT:  Okay.  His conditions of release are
20      going to remain in effect until he reports, but I'm going to
21      orally modify -- we'll modify those conditions and simply
22      say he does not have permission to work this weekend --
23              THE DEFENDANT:  So I can't work?
24              THE COURT:  -- until he reports.
25              Correct.  Correct.
```

1           And he'll have -- his curfew --

2           THE DEFENDANT:  So --

3           THE COURT:  -- will begin at 9:00 o'clock --

4           THE DEFENDANT:  No, (inaudible) --

5           THE COURT:  -- p.m.

6           THE DEFENDANT:  Fucking come and get me now.  Just

7    come get me now.  Let's go.  By the way, everybody on this

8    interview right now is going to be on CNN.  Let's go.

9           THE COURT:  Mr. Pruitt, just so you know, it's a

10   separate -- it is against the law to --

11          THE DEFENDANT:  To --

12          THE COURT:  -- record our --

13          THE DEFENDANT:  To what?

14          THE COURT:  -- hearing -- to record our hearing --

15          THE DEFENDANT:  I didn't record --

16          THE COURT:  -- here today.

17          THE DEFENDANT:  -- anything.  I didn't --

18          THE COURT:  Okay.

19          THE DEFENDANT:  -- record anything.

20          THE COURT:  Mr. Pruitt --

21          THE DEFENDANT:  But if you --

22          THE COURT:  Mr. Pruitt --

23          THE DEFENDANT:  If you think I'm not --

24          THE COURT:  -- I'm just --

25          THE DEFENDANT:  -- just going to CNN and say that

1    you violated my First Amendment right and that's why you're

2    locking me up, I will.

3              THE COURT:  Mr. Pruitt --

4              THE DEFENDANT:  You know what?  I will --

5              THE COURT:  -- I'm extending you --

6              THE DEFENDANT:  I will come now.

7              THE COURT:  Mr. Pruitt, I'm extending you the

8    courtesy.  The order will say that you have to report by

9    2:00 o'clock on Tuesday, but you are -- but you're not

10   authorized to work --

11             THE DEFENDANT:  But I can't work?

12             THE COURT:  -- over the weekend --

13             THE DEFENDANT:  So I can't --

14             THE COURT:  -- and you may --

15             THE DEFENDANT:  -- work?

16             THE COURT:  -- and you --

17             THE DEFENDANT:  So what's the point?

18             THE COURT:  -- and your curfew does --

19             THE DEFENDANT:  What is the point?

20             THE COURT:  -- begin at 9:00 o'clock.

21   Mr. Curfew [sic] -- Mr. Pruitt --

22             THE DEFENDANT:  What is the point?

23             THE COURT:  Mr. Pruitt, I have not asked to hear

24   from you.  Thank you, sir.

25             THE DEFENDANT:  Okay.

```
 1              THE COURT:  All right.

 2              THE DEFENDANT:  (Inaudible.)

 3              THE COURT:  Ms. -- Mr. Pruitt.

 4              Ms. Schuck, anything further you need from me in

 5    that order?

 6              THE PROBATION OFFICER:  Pretrial Services would

 7    request that the Court order the defendant to keep his GPS

 8    device charged until he self-surrenders.

 9              THE COURT:  All right.  I will certainly -- I will

10    include that in the order.  And, obviously, that's -- well,

11    that's part of his current conditions; correct?  So I mean,

12    he should still be --

13              THE PROBATION OFFICER:  He --

14              THE COURT:  He -- that's something --

15              THE PROBATION OFFICER:  Yes, Your Honor --

16              THE COURT:  -- he should --

17              THE PROBATION OFFICER:  -- but we would like it

18    reiterated.

19              THE COURT:  Understood.  Understood.

20              Mr. --

21              THE DEFENDANT:  You know, it's been charged for

22    the whole year.  I've never --

23              THE COURT:  Mr. Jenkins --

24              THE DEFENDANT:  -- had it not charged.

25              THE COURT:  Mr. Jenkins, I'm going to --
```

 1              MR. JENKINS:  Yes, Judge?

 2              THE COURT:  -- address Mr. Pruitt --

 3              Well, first of all, I'm going to say this.

 4     Mr. Pruitt, you have to keep -- are you telling me you don't

 5     want this time over the weekend to get your affairs in

 6     order?

 7              THE DEFENDANT:  I would love the time over the

 8     weekend.

 9              THE COURT:  All right.  So I'm going to give you

10     that time.  You are --

11              THE DEFENDANT:  I appreciate it.

12              THE COURT:  Your current conditions, all right,

13     remain in effect until you surrender --

14              THE DEFENDANT:  But --

15              THE COURT:  -- on Tuesday --

16              THE DEFENDANT:  But I can't work?  I can't --

17              THE COURT:  -- and --

18              THE DEFENDANT:  -- work?

19              THE COURT:  -- except for the fact that you may

20     not work.  And your curfew is going to be at 9:00 o'clock,

21     as it always has been, but you're not authorized to work and

22     you're not authorized to -- well, let me put it this way.

23     Let me put it this way.

24              THE DEFENDANT:  I'm not authorized to work?

25              THE COURT:  You're not allowed -- Mr. --

```
 1                THE DEFENDANT:  (Inaudible.)

 2                THE COURT:  Mr. Pruitt, what you're not allowed to

 3      do is work past 9:00 o'clock.  I guess that's my point.  If

 4      you --

 5                THE DEFENDANT:  Well, then that --

 6                THE COURT:  There's no reason for you not to --

 7                THE DEFENDANT:  (Inaudible.)

 8                THE COURT:  There's no reason for you --

 9                THE DEFENDANT:  That's fine.

10                THE COURT:  -- not to work --

11                THE DEFENDANT:  I guess I quit my job today.

12                THE COURT:  Mr. Pruitt --

13                THE DEFENDANT:  (Inaudible.)

14                THE COURT:  -- I'm not -- Mr. --

15                THE DEFENDANT:  That's messed up.

16                THE COURT:  Ms. Harris, will you mute Mr. Pruitt,

17      please.  Thank you.

18                MS. LOEB:  Your Honor, this exchange is starting

19      to give the Government some concern about whether

20      Mr. Pruitt's going to follow the Court's order and surrender

21      as directed on Tuesday.

22                THE COURT:  I'm going to give him -- he's got --

23      he's biting off a much bigger problem for himself if he

24      doesn't, I hope he realizes.

25                And, Mr. Jenkins --
```

1    THE DEFENDANT:  I'm not going to --

2    THE COURT:  -- I'm sure --

3    THE DEFENDANT:  I'm not going to --

4    THE COURT:  And, Mr. Jenkins --

5    THE DEFENDANT:  -- not surrender --

6    THE COURT:  -- I'm sure --

7    THE DEFENDANT:  -- myself.

8    THE COURT:  Mr. Jenkins, I'm sure you're going to

9    explain to him the problem that he will have.

10    But I am going to give him that -- I am going to

11    give him that courtesy and allow him to wrap up whatever he

12    needs to by Tuesday.  But I am going to say he's not

13    permitted to -- he must keep his GPS device charged between

14    now and then --

15    THE DEFENDANT:  (Inaudible.)

16    THE COURT:  -- and all his other conditions are in

17    effect from now until then --

18    THE DEFENDANT:  Can somebody please --

19    THE COURT:  -- and --

20    THE DEFENDANT:  -- send me the address?

21    THE COURT:  -- and -- Mr. Pruitt, you're going to

22    get an order from the Court that's going to explain exactly

23    what's going to -- you're going to be -- have to do and

24    Mr. Jenkins is going to walk through that with you, I'm

25    sure, to make sure there aren't any hiccups.

1        THE DEFENDANT:  There won't be.

2        THE COURT:  Ms. Loeb --

3        So in light of that change of affairs, my -- and

4   change with regard to Mr. Jenkins's [sic] status, my thought

5   is to come back on a relatively short turnaround to see what

6   the parties want to do going forward.  And looking at my

7   calendar, I have a little time on February 3rd which is

8   exactly three weeks from today.  So my proposal to counsel

9   is that we come back on that day.  And, obviously, again,

10  given Mr. Pruitt's situation, the parties can -- we can talk

11  about where we go from here in this case.

12        Ms. Loeb, what is your reaction to that proposal?

13        MS. LOEB:  Your Honor, that works for the

14  Government.

15        I also can make a record about some of the

16  discovery that we've been providing in this case to

17  Mr. Pruitt, both case-specific discovery and the global

18  discovery that applies across Capitol riot cases, if that

19  would be appropriate now.

20        THE COURT:  Yeah, I think it --

21        THE DEFENDANT:  (Inaudible.)

22        THE COURT:  I think it would be.

23        You know, the other thing -- before we move off

24  this, the one other thing I'm going to say is, Mr. Pruitt,

25  you know, from the beginning of this case, I was very -- I

1    was, and am, very sympathetic to defendants wanting to work

2    while a case is pending.  Just because there's a case

3    pending doesn't mean that you -- consistent with all the

4    things conditions of release are supposed to do, that you

5    shouldn't be able to try to earn a living for your family.

6    And I've bent -- I mean, I -- we bent over backwards to try

7    to make that happen.  And I'm sorry it didn't work out,

8    but --

9              THE DEFENDANT:  What happens --

10             THE COURT:  -- I --

11             THE DEFENDANT:  -- that it is --

12             THE COURT:  Mr. Pruitt, I --

13             THE DEFENDANT:  (Inaudible.)

14             THE COURT:  Mr. Pruitt --

15             THE DEFENDANT:  (Inaudible.)

16             THE COURT:  Mr. Pruitt, but I do believe you

17    abused that, and that's why we are here.

18             THE DEFENDANT:  The only --

19             THE COURT:  Mr. Jenkins --

20             THE DEFENDANT:  Well, you're only hurting --

21             THE COURT:  Mr. --

22             THE DEFENDANT:  -- my eight- --

23             THE COURT:  Mr. Pruitt --

24             THE DEFENDANT:  You're only hurting my eight- --

25             THE COURT:  Mr. --

```
 1                THE DEFENDANT:  -- and my ten-year-old.
 2                THE COURT:  -- Pruitt --
 3                Ms. Jenkins -- Mr. Jenkins, what's your view on
 4      the three weeks?  Coming back on the 3rd.
 5                MR. JENKINS:  Your Honor, in light of the Court's
 6      action today, we certainly would request the earliest
 7      possible date.  Having discussed this possibility with
 8      Mr. Pruitt, it's my understanding that he would like to see
 9      the case move along as expeditiously as possible in light of
10      his pending detention.  The problem, however, is that on
11      February the 3rd, Your Honor, I will be engaged -- or
12      scheduled to be engaged in a jury trial in the Eastern
13      District of Virginia.  The presiding judge, Your Honor, does
14      not convene jury trials on Fridays.
15                THE COURT:  Okay.
16                MR. JENKINS:  So if the Court is inclined to set
17      it for a Friday, that would probably work best for my
18      calendar.
19                THE COURT:  So we could look at the 4th, then.
20                Ms. Loeb, how does the 4th look for you?
21                MS. LOEB:  Your Honor, we're available then.  I am
22      located on the West Coast.  And if the Court can accommodate
23      me with an afternoon hearing, I would appreciate it.
24                THE COURT:  All right.  I have made a practice of
25      trying to accommodate defendants, defense counsel, and
```

1    prosecutors, wherever they are.  So let's set it --

2    Mr. Jenkins, how about the 4th at 2:00 o'clock?

3              MR. JENKINS:  That's agreeable, Your Honor.

4              THE COURT:  All right.  And, you know, that's -- I

5    want -- on the one hand, I want to give the parties space

6    to, sort of, see where they think this thing is headed, and

7    that -- I think that amount of time balances that with

8    giving -- with not going too far into the future, obviously,

9    because of Mr. Pruitt's status.

10             Let me hear -- I mean, I do think, given that

11   relatively short period of time, for reasons of discovery,

12   and also, given the virus and the fact that our courthouse,

13   at least for probably that amount of time, is going to be

14   relatively at a standstill in terms of trials and Chief

15   Judge Howell's orders, that I can exclude speedy trial

16   between now and then.  What we do beyond that going forward,

17   we'll see.

18             But, Ms. Loeb, what's your request -- we are

19   setting it, then, for that time, February 4th at 2:00

20   o'clock.  What's your request what I do with speedy trial

21   between now and then?

22             MS. LOEB:  Your Honor, we would request that the

23   Court exclude time in the interests of justice and for the

24   effective preparation of counsel.  Since we were last

25   together, we've produced defendant's cell phone which

1    includes a voluminous amount of data.  We've produced the

2    grand jury --

3              THE DEFENDANT:  You've had my cell phone for a

4    year.

5              MS. LOEB:  We've produced the grand jury

6    transcript --

7              THE DEFENDANT:  A year.

8              MS. LOEB:  -- videos from TikTok, the audio

9    recording of defendant's post-arrest interview, the search

10   warrant, and other items.  We do have some additional

11   information from the defendant's FBI case file to produce.

12   In addition, we've produced several volumes of the global

13   discovery which includes thousands of files from Capitol

14   Police CCTV, body-worn camera, documents we created to

15   assist with the review of body-worn camera footage, internal

16   investigation reports, FBI reports from interviews of law

17   enforcement officers, and other items.  And I would just add

18   that given Mr. Pruitt has made statements to the effect of

19   he was de-escalating or officers --

20             THE DEFENDANT:  Yes, I was.

21             MS. LOEB:  -- (inaudible) -- he was helping

22   officers, this is the kind of case where it seems that

23   review of that larger population of video may be

24   appropriate.  And the Government is still working diligently

25   to produce additional items.  Notably, the results of

1    searches of other defendants' electronic devices and other

2    media obtained through Stored Communication Act search

3    warrants.  So given the volume of discovery, the

4    Government's ongoing diligence in producing it, and the

5    defendant's need to review it, we think an exclusion of time

6    would be appropriate.

7            THE COURT:  All right.  Mr. Jenkins, what's your

8    view on that?

9            MR. JENKINS:  Your Honor, again, having previously

10   discussed this possibility with Mr. Pruitt, I will represent

11   that Mr. Pruitt objects to any time being excluded from the

12   speedy trial between now and the next time that we'd be

13   appearing before the Court.

14           THE COURT:  All right.  Well, I understand that

15   position, for sure.

16           I do think, at this point, I'm going to --

17           I'll just say to the Government, look, I think,

18   as, you know -- the discovery issues in these cases --

19   certainly, I understand we're talking about voluminous

20   discovery, and certainly these recent statements may well

21   have opened up -- I mean, I probably -- it's probably

22   reasonable now to assume that there is a larger group of

23   material that you're going to have to produce, given --

24   perhaps given some of the things -- the -- some of the

25   back-and-forth between the parties about what exactly

1    Mr. Pruitt was or was not doing in the Capitol that day.

2              I do think -- so I will find that the time between

3    today's date and only this little bit of time from now

4    through February 4th is excludable under the Speedy Trial

5    Act because the ends of justice that are served by taking

6    such action outweigh the best interests of the public and

7    the defendant in a speedy trial.  And I am going to do so at

8    least for now because -- for two reasons.  One, because of

9    the voluminousness of discovery and because of -- even if

10   much discovery has been produced, there's clearly additional

11   information that is to be produced, and now that the parties

12   are going to be engaged, I think, a little more seriously

13   about the scope of that discovery, I think the parties need

14   time to engage about exactly how -- what discovery that

15   perhaps the Government hasn't produced that, Mr. Jenkins,

16   you think is required must be produced.  And the Government,

17   in this case and in others, has made representations about

18   the voluminousness of the discovery in these cases

19   generally.  And so I think, with the -- for the next three

20   weeks, I can rely on those representations.  I would say --

21   and the representations Ms. Loeb just made about the need to

22   provide additional discovery.

23              But I think the other -- at least for this short

24   period of time, I think the other thing we have is the

25   public health situation.  Chief Judge Howell entered Order

1    21-79 on December 13th which tolled -- presumptively tolled

2    -- or at least -- yeah, presumptively tolled, we'll say, the

3    speedy trial clock in cases through February 18th of this

4    year.  I do adopt in this case the findings she made in that

5    case and the -- her reasoning in excluding the Speedy Trial

6    Act here.

7            I'll also add that on December 30th, Chief Judge

8    Howell entered Standing Order 21-83 which actually, because

9    of the uptick in cases here in the District and around the

10   country, suspended trials through January 22nd, I believe it

11   is, and my understanding is that that order is going to be

12   extended soon for another few weeks.  So I do think, based

13   on -- again, I adopt the findings in that order, and I think

14   on -- for that -- and based on those two standing orders and

15   the specific facts and circumstances of this case and the

16   fact, again, the court is -- the courthouse is simply not,

17   consistent with the public health, hosting jury trials,

18   again, through the 22nd at least, but my understanding is

19   for another two weeks, based on those -- all that reasoning,

20   I will exclude the Speedy Trial Act through --

21            THE DEFENDANT:  Why is there a public --

22            THE COURT:  -- February 4th --

23            THE DEFENDANT:  Why is there --

24            THE COURT:  -- in this case.

25            THE DEFENDANT:  -- a public media line on there?

1            THE COURT:  All right.  So with that said --

2            THE DEFENDANT:  I want to know.

3            THE COURT:  -- Ms. Loeb, is there anything further

4     from you in this matter?

5            MS. LOEB:  Nothing from the Government, Your

6     Honor.

7            THE COURT:  All right.  Mr. Jenkins, anything

8     further from you?

9            MR. JENKINS:  Nothing from the defense, Your

10    Honor.

11           THE COURT:  All right.  I will enter that order

12    promptly.  And, Mr. Jenkins, it will provide that guidance

13    as to exactly where your client should report as directed,

14    as I said, by 2:00 o'clock on Tuesday.

15           MS. LOEB:  Your Honor --

16           THE COURT:  Until then --

17           MS. LOEB:  -- will our next hearing be by video?

18    I apologize.

19           THE COURT:  Ah, that is a good question.  Yeah,

20    Ms. Loeb, part of the answer to that -- I guess, part of the

21    answer to that question will be technical.  Assuming we can

22    get Mr. Pruitt, I think we should assume it's going to be --

23    well, and given where you are in particular -- so I think --

24    let's put it this way.  I would -- let's operate under the

25    assumption we're going to be virtual as we are today, and as

 1    we get closer, we'll play it by ear.

 2              MS. LOEB:  Thank you, Your Honor.  Nothing further

 3    from --

 4              THE DEFENDANT:  Yeah.

 5              MS. LOEB:  -- the Government.

 6              THE DEFENDANT:  I mean, I'll --

 7              THE COURT:  All right.  Anything further from you,

 8    Mr. Jenkins?

 9              MR. JENKINS:  No, Your Honor.  Thank you.

10              THE COURT:  All right.  Very well.  We'll see

11    everyone in three weeks.  Until then --

12              THE DEFENDANT:  I'm actually a --

13              THE COURT:  -- the parties are dismissed.

14              THE DEFENDANT:  -- law abiding citizen, unlike the

15    BLM pieces of shit.

16              (Proceedings concluded at 4:56 p.m.)

17                    *  *  *  *  *  *  *  *  *  *  *

18              <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

19        **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

20    **certify that the above and foregoing constitutes a true and**

21    **accurate transcript of my stenographic notes and is a full,**

22    **true and complete transcript of the proceedings to the best**

23    **of my ability, dated this 16th day of February 2022.**

24        **Please note:  This hearing occurred during the COVID-19**

25    **pandemic and is, therefore, subject to the technological**

1    limitations of court reporting remotely.

2                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                              Official Court Reporter
3                              United States Courthouse
                              Room 6722
4                              333 Constitution Avenue, NW
                              Washington, DC 20001
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25