### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-23-TJK** |
| **JOSHUA PRUITT,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Pruitt to 60 months' incarceration (a mid-range sentence), three years of supervised release, $2,000 in restitution, no fine, and the mandatory $100 special assessment.

### I.     INTRODUCTION

Joshua Pruitt, a Proud Boys member, bartender, and personal trainer from Silver Spring, Maryland, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

Pruitt wanted to send a message. By what he said, wore, and did on January 6, this Proud Boys initiate was a one-man symbol of the angry mob at the Capitol that day. He was on the front lines of some of the earliest confrontations with police inside the Capitol building. Well over a year later, many officers remembered him as an instigator. Wearing a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher"—an antihero known for dispensing violent vigilante justice—Pruitt made a calculated choice to use his thickly muscled appearance to communicate to the police that they faced a dangerous person.

As Pruitt's attire reflected, he was indeed prepared for violence on January 6. He had joined a chat in encrypted digital messaging program where his local Proud Boys chapter discussed and encouraged the use of violence on January 6. Their plans were not limited to fighting Antifa: they anticipated going to the Capitol to stop the certification of the election and confronting police who might try to stand in their way.

Pruitt was the Proud Boys' ideal recruit for that day. Even while wearing an electronic ankle monitor (because he had recently been arrested), Pruitt advertised his desire to participate in the violence. On January 6, he carried out the group's directives. He donned his tactical glove during his approach to the Capitol Building and climbed a ladder to be at the front of the mob that breached the building, seeking to overturn the election results. He took part in several standoffs between the mob and the police, and he was one of the few rioters to come face-to-face with a member of Congress trying to evacuate. That member was then-Senate Minority Leader Chuck Schumer. One look at Pruitt, and the leader of Senator Schumer's security detail immediately saw the threat and hustled the 70-year-old Senator down a hallway, having to change their evacuation route on a dime. As the leader of the security detail later told the FBI, when he saw Pruitt coming

2

toward them, only seconds from reaching Senator Schumer, it was harrowing—a moment, he told the FBI, he would never forget.

Following his arrest, the defiant Pruitt doubled down, spreading false information about the riot, claiming he had done nothing wrong and had no regrets. In a series of social media videos, he continued to espouse violence and threaten others.

Pruitt's criminal record suggests his conduct on January 6 was not an aberration; Pruitt has engaged in threatening behavior in his past. He was on probation *and* pretrial release on January 6, flouting multiple courts' trust and authority by storming the Capitol. With Pruitt's criminal history and the evidence of preparation and planning for January 6, he cannot claim to be an otherwise law-abiding citizen who got caught up in a moment.

The government recommends that the Court sentence Pruitt to 60 months' incarceration, within the advisory Guidelines' range of 51-63 months. Pruitt's preparation and coordination with other Proud Boys, his actions on January 6, his prior criminal history (which the Guidelines undercounts), and the fact that he committed this offense while on supervision *and* pretrial release collectively support a mid-range sentence.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Pruitt among them, unlawfully broke into the Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and

stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the PSR and the Statement of Offense incorporated into Pruitt's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the Capitol. Temporary and permanent barricades were in place around the exterior of the building, and Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings could not resume until approximately 8:00 p.m., after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-7; PSR ¶¶ 20-26.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous

weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the Capitol, resulting in losses of more than $2.7 million.

### B.    Defendant's Role in the January 6, 2021 Attack on the Capitol

A full account of Pruitt's participation in the attack on the Capitol begins with him taking the Proud Boys' oath on the streets of Washington, D.C. on November 14, 2020. At the time, Pruitt was a D.C. resident, working as a bartender. That day, the pro-Trump "Million MAGA March"

had taken place to protest the election results. The march gave way to violent clashes after dark and included members of the Proud Boys. *See, e.g.,* Marissa J. Lang, et al., *The Washington Post,* "After thousands of Trump supporters rally in D.C., violence erupts when night falls," *available at* https://www.washingtonpost.com/dc-md-va/2020/11/14/million-maga-march-dc-protests/ (Nov. 15, 2020).

According to Pruitt, he was fighting with people he believed to be part of Antifa, and the Proud Boys "saved me from being jumped." He proceeded to participate in an initiation ceremony led by Proud Boys Chairman Enrique Tarrio where he repeated the Proud Boys credo: "I am a Western chauvinist. I refuse to apologize for creating the modern world. I am a Proud Boy."

An individual nearby filmed Pruitt's initiation and posted it to social media. A screenshot is below; Tarrio holds a microphone to his mouth as Pruitt, in a black tank top, stands before him.



*See* https://twitter.com/bgonthescene/status/1327792375863898112.

7

In text messages sent to acquaintances in the days following the initiation, Pruitt first claimed that he knew nothing about the Proud Boys and was drunk when he took the oath. He complained that he had been "blacklisted" in Washington, D.C. from working as a bartender as a result of the publicity. He also, however, boasted that the video had received "17 million views" and led to his introduction to "high up conservatives," who shared with him election-fraud and other related false information, which he then began to circulate. He also began to converse with like-minded individuals regarding his views of the presidential election and his desire to see President Trump declared the victor—including the Proud Boys.

### *Pruitt's Coordination with the Proud Boys*

Pruitt met up with the Proud Boys again for a pro-Trump rally in Washington on December 12, 2020. A friend asked Pruitt if he had connected with the Proud Boys; he said that he had and commented, "apparently I'm a damn celeb amongst the Trump supporters." In the evening of December 12, members of the Proud Boys clashed with counter-protesters, and Enrique Tarrio participated with a group that included members of the Proud Boys in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which was the property of Asbury United Methodist Church in Washington, D.C. A few days later, Pruitt asked an individual to provide a contact for the "local proud boy's," and the individual responded by sending a link for the Proud Boys' Maryland chapter and a Gmail address for the group.

Pruitt's involvement with the Proud Boys deepened, and he began to take part in the local Maryland/DC chapter's planning discussions for January 6. On December 18, under the username "JackedDC," Pruitt joined the chapter's group chat called "Cleared for Entry" on an encrypted messaging application. The chat, which the FBI later recovered from Pruitt's cell phone, included

the leadership of the Maryland/DC Proud Boys as well as new or prospective members, such as Pruitt. According to the chat, Pruitt was still a Proud Boys "prospect," but, unlike other novitiates, he was among a small group permitted to "wear and/or own PB gear." Pruitt introduced himself to the other members of the group by posting a photo where he flashed a Thor's hammer ring:



After introducing himself, Pruitt complimented the Proud Boys chapter on being "some of the more organized badasses" and explained "That's why I was staying around you guys" (at the December 2020 march).

The next day, December 19, another member of the Proud Boys (username "Downtown GIMLI") reported in the chat, "Trump has put Special Forces under civilian control......get ready." Pruitt responded, "Oh fk." A discussion of an imminent violent coup ensued. Downtown GIMLI told the group, "Dont pray, load!" Another member warned, "Intel agencies, federal LE, DOJ aren't protecting the interests..." Another said, "I've heard officer generals and career folk are the enemies of the ppl or the American way." Pruitt chimed in to share that he heard from a "good source" that the White House had been evacuated. Another member asked, "Think they can push this coup until after the first of the year so I have time to get my new toy sighted in?" and then posted this photo of a firearm:



Later that day, Donald Trump tweeted plans for a "wild" protest in D.C. on January 6 ("Big protest in D.C. on January 6. Be there, will be wild!"). One member of the chat posted a screenshot of Trump's tweet to the chat. Another noted that the "wild" protest would take place "[t]he day Senate confirms election." Pruitt and others speculated about whether these "protests" would continue to be a monthly occurrence.

The same day, Downtown GIMLI reposted a post from a website, thedonald.win, reacting to Trump's tweet. The author of the post vowed that he would be armed and would not stop at the steps of the Capitol, but would come to the "FRONT FUCKING DOOR." He called, "Join me. Surround it. It belongs to us." He vowed not to obey "any authority but the Commander in Chief." He warned police: "Law enforcement in the Capitol has chosen the wrong side…insist DC police stand down or face the consequences…They have forgotten their oaths. They will be sternly reminded." The post then called for a "sea of patriots" to seize the Capitol: "This massive gathering of Americans should start with a 360 degree surrounding of the capitol building and spread outward. Nobody in or out without our permission. Don't be distracted by stages and speeches and events." After posting the screenshot, Downtown GIMLI wrote, in capital letters, "READ." Later (still on December 19), he said, "Its officially a MILLION MAGA PROTEST on the 6th." Pruitt responded, "Let's roll."

The same day, Pruitt wrote in the chat, "I'm ready to fk shit up lol." He said, "I just want to do whatever needs to be done to be legit" (*i.e.*, become a full member of the Proud Boys). On

December 21, Pruitt asked the group for "Any info on in general what's going down on the 6th in DC?" Another member replied, "Haven't heard much from our PB inside guys on here. I've read one place a call to surround the capital build has been thrown out. I haven't read or heard any hard details yet. I know I will be there to show support regardless of PB status." Pruitt agreed, "Will be there no matter what." The next day, another individual reported, "There will probably be a march a whole shit show." Pruitt asked if he was "ok to rep" (i.e., wear Proud Boys garb) or if he should just wear his "normal cutoff."

The next day, Pruitt messaged a friend (who was not a member of the Proud Boys) that he planned to be "downtown" on the 6th. She replied, "I am going. I can't wait until something happens." He asked her, "can we still win?"   She said, "they have to pull the resources and might seize the servers from Michigan and Pennsylvania." Pruitt responded, "I feel like they are playing so dirty and we are being politically correct and need to just go 100 mph at them now."

Pruitt continued to discuss gear and attire with the Proud Boys. On December 23, Downtown GIMLI recommended a seller of stab vests. Pruitt responded, "Oh good shit." Pruitt then sent a photograph of a t-shirt with the Punisher logo and said, "Might rock this on the 6th. Of course I'm cutting the sleeves off though." On December 31, he shared his plans to order an imprinted mouthguard.

Pruitt also provided logistical support to the Proud Boys chapter. He advised that a hotel and bar that had previously served as a Proud Boys hangout would be closed January 4-6. He then offered his apartment to any other members needing a place to stay on January 6. Another member of the chat told Pruitt he would be arriving on January 5 and would message Pruitt; Pruitt responded, "Sounds good bro."

The chat also included explicitly anti-Semitic and racist memes. On December 26, another member of the chat posted a *Washington Post* headline reading "Denying the Holocaust threatens democracy. So does denying the election results." After other members of the group made anti-Semitic comments, Pruitt chimed in, "Damn penny hoarders." On December 31, Downtown GIMLI posted images of Hitler and other white power slogans and images, such as:



In an apparent attempt to ingratiate himself with a local leader of the Proud Boys, Pruitt responded with a YouTube link to a video of Jewish jokes from a television show and said, "That's for you downtown lol."

In the meantime, on December 28, Pruitt was arrested and charged in D.C. Superior Court with violating a temporary protective order obtained by a former girlfriend, who reported that Pruitt had harassed, threatened and verbally abused her. (Case No. 2020-DVM-1642; PSR ¶ 73). Pruitt was released with an ankle monitor.

Pruitt's arrest did not cause him to back away from any plans for January 6. He remained an eager follower of the Proud Boys' plans and sought acceptance and approval from its leadership. The next day, another member said in the chat that Pruitt and four others were "green lit to be officially sworn in as 1st degrees" (to the Proud Boys). As such, they were allowed to wear or own

"PB gear." However, the member cautioned, communicating direction from Proud Boys leadership, "NO ONE is allowed to wear PB gear to the rally on the 6th. There is a colors ban."

Pruitt regularly posted menacing pictures of himself to their chat, such as the following, which he accompanied with the question "should I just come like this on the 6th lol."



Here are two other examples, each of which Pruitt accompanied with the comment, "Ready for the 6th.""



13



Pruitt also discussed his Proud Boys initiation and plans for January 6 over text message with a New York-area Proud Boys contact. On December 31, Pruitt reported he had "bought a damn mma mouth guard, got my wrist Straps and a glove so I don't break my fking hands on one of these pussies." He vowed "to fuck some shit up on the 6th way more then before." The associate advised him to "gear the fk up," and Pruitt reassured him that "someone is bringing a vest for me." The next day, he told the associate that he planned to meet the "Maryland/dc chapter" on January 6 and had also been making plans for a formal initiation. He explained, "I've been told I'm approved…well unofficial by Enrique." He continued, "vetting is over" and "game time."

On January 2, the encrypted chat involving the Maryland/DC Proud Boys turned to talk of a looming civil war.  Downtown GIMLI again took the lead, encouraging others to "dispense justice" and not be afraid to fight. One member observed, "Police are tear gassing and beating trump supporters now I have a feeling Jan 6 will be a fight immediately." Downtown GIMLI responded, "We have to totally overwhelm them. Dont be affraid of jail......you will be a prisoner to tyrannts if you dont and will be enslaved forever. If the police try this shit it is our CONSTITUTIONAL duty to take them out." He explained, "We will flank and envelop them and they WILL run," and "If they push it we go hot." He urged the members to "Be brave. Your

forebearers brought you freedom at a heavy cost…what will you do for generations to come?" and warned "we are one step closer to civil war." Another agreed: "I knew it only matter of time before cops turn on citizens."

For his part, Pruitt expressed readiness for violence. On January 3, another member of the chat circulated a YouTube video posted by an individual supporting the payment of reparations to African people. Referring to the poster, Pruitt responded, "Hope I get to see him on the 6th…he will continue his life eating out of a fucking tube."

On January 4, Pruitt wrote, "Morning guys…ok. I'm amped up lol. My chick (now ex ) left me yesterday lol. So the 6th' should be fun for me. Built up frustration ready to come out. Makes me even more dangerous." Downtown GIMLI responded with some instructions for January 6. He said, "Lt Rich will be in charge of this gathering." He continued, "Im going to assume we all know the thing kicks off at the ellipse at 11 and the march will be to the capitol building." He noted he would bring beer. Pruitt asked, "What block is the ellipse?," showing that he was tracking the discussion. Downtown GIMLI also cautioned, "Comms will be a problem and we dont have radios . . . be prepared to be out of contact." Pruitt boasted, "Im pretty easy to spot" and "it will be 44 degrees that day, I'll be a cut off lol." As Downtown GIMLI continued to give directions, Pruitt repeated his enthusiasm and readiness to fight:

| Downtown GIMLI[2] | Try not to get seperated.....this event is going to be super heated both sides have had enough....dont want my boys caught alone......plan for the worst hope for the best...... |
| | |
| | Get in your heads that the left is attempting to take your country from you......this is not a party, savvy? |

---

[2] Aside from Pruitt's name, the names used here are the either usernames from the encrypted chat among the D.C./Maryland Proud Boys or the initials corresponding to the username.

|  | It could explode at any moment...... |
|---|---|
| **PRUITT** | 100 percent |
| **PRUITT** | I'm battle ready |
| **PRUITT** | [YouTube link to song called "Beast"] |
| **PRUITT** | Here's your amp up music for these fkin commies |
| M.D. | Sorry to hear that bro ... take it out on some antifa/blm trash on Wednesday! |
| **PRUITT** | That's the plan bro |
| **PRUITT** | [screenshot with caption "This Caravan is headed to DC from California RIGHT NOW] |
| **PRUITT** | It's going down |

That same morning, members began to joke about attacking prominent women. Pruitt participated.

| M.D. | I know a couple of chicks that I'd like to kick in the balls ... cough cough *pelosi* cough |
|---|---|
| Charlie 10 Fingers | "right in the ole' axe wound..." |
| J.H. | Id like to see the "squad" lined up there for some ball kicking action. Maybe Michael Obama. Although, she(he) may have a slightly more severe reaction. Lol. |
| **PRUITT** | Lol |
| Downtown GIMLI | That big bald cunt looks like a linebacker might lose your foot |
| **PRUITT** |  |
| **PRUITT** | Getting ready for these clowns |

Then, on January 4, Enrique Tarrio was arrested in Washington, D.C, for the December 12 burning of a "#BLACKLIVESMATTER" banner that had been stolen from a Washington, D.C. church. He was detained briefly, and upon his release on January 5, he was ordered to leave the District of Columbia. The Maryland-DC Proud Boys encrypted messaging group erupted in anger and talk of violence against the police and Antifa, with Pruitt among the most vocal. Downtown GIMLI openly advocated for fighting and "blow[ing] up dc police hq phone lines." Pruitt's comments included "Ok, real shit we are not holding back," "I'm going for blood now," "Now I'm in fking battle mode, that Enrique shit, nah, fk you ... die slow," and "I'm ready as fk." He also posted a shirtless photo, showing off his physique.

Anti-government rhetoric continued in the wake of Tarrio's arrest. Once they learned that Tarrio also had two high-capacity magazines on him when he was arrested, members of the chat called the charges "trumped up," and began to speculate that the "dirt bag" D.C. mayor had "set it all up" to charge "one of ours with possession of ammunition." Downtown GIMLI commented, "This arrest is meant to demoralize us…the govt knows how to play this game. Wake up."

In a separate text exchange, a New York Proud Boys contact told Pruitt, "Yeah, he got popped...we'll see what happens to him...March your ass off bro! Epic." Pruitt replied, "Done and done," and his friend said "POYB"—"Proud of Your Boy," a Proud Boys slogan.

The next morning, January 5, Pruitt and others discussed tactics for January 6 in the encrypted messaging group established for the Maryland-DC Proud Boys recruits and prospects. They addressed how to avoid police scrutiny while still engaging in attacks. Another member speculated that the police had been surveilling Tarrio, and Pruitt responded, "well…they just unleashed the beast…cause now I'm pissed. Wrong MFer, of course we are back the blue, but stay

out of my way [and] don't be an innocent bystander." Another user said that, at the last rally, "the POPO was pushing US BACK…these pussies need a reality check in real world knowledge!!!" Pruitt replied, "They gonna get it," and then, "We need to be tactical." "Tactical," to Pruitt, meant that "20 hold cops down. And like 4 hard hitters run around." He also said, "Built up BS is ready to explode . . . so someone calm me down if I go to hardcore."

Another member raised the possibility that "police turn on protesters and beat them back and start throwing them in jail I can see it coming." Pruitt replied, "Wednesday [January 6] is gonna be crazy and different and we gotta be ready." Another member cautioned about the risk that "threats of or actual violence will give local/state/federal LE predicate... that opens up a bunch of tools they can use to paint the picture they want to see." He suggested "tactical restraint." Pruitt reassured him, "I'm not hitting a cop period," "not my thing." He later explained, "We should only strike when they come first period," and "at that point we put in work." Another member noted that Pruitt was "hard to miss" and a "perfect symbol of nazi/white suprem[acy]/etc PB." Pruitt replied, "Yea I know," and "Which is why I got to be the most careful."

Later in the morning on January 5, Downtown GIMLI sent a message to inspire the members to take part in the coming "civil war." He urged them to "stay focused and have no fear," to "risk everything you have up to and including your liberty and your life" and "prepare to die so that we may live," noting that "those who fall will live in the hearts and minds of those who survive to taste the sweet fruit of liberty." He urged, "If you want FREEDOM for all then stand by me.....stand with your brothers, fellow patriots here and around the world and FIGHT!"

Pruitt then told the group that he was heading to the "courthouse" and that "PB is already there for Enrique." Pruitt said, "I'm clearly in a cut off shirt." He continued, "it's on." He made plans to meet a friend the following day—not at the rally, but by the Capitol.

That afternoon, a Proud Boy sent "directives" to the encrypted messaging group:

1. Don't bunch up and march together as Proud Boys. They'll pick everyone out and know exactly who/where you are at all times. Instead permeate the crowd. Maybe move with a couple buddies or schmooze with friends you know.

2. Have fun but know it could turn hot. Once word comes down about the electoral votes, the normies will make a stink. Make a stink with them. Maybe bring up the fact that Enrique has been arrested, too.

3. If unrest begins, go with the flow. Let the normies wake up America. Show them the PEOPLE are pissed. Not just the PBs. We made our show case already.

4. Don't be a heat magnet. Proud Boys have a ton of heat in DC. This includes the most recent civil suit by AME. Don't be the tip of the spear. You'll get us fucked up by the feds or worse.

5. Bring beer and food. Everywhere is shut down as you know.

6. Don't bring guns.

7. If you get totally lost look for Rich or Rufio. Rich is in charge of our chapter and Rufio is in charge of National. Just stick with a buddy and don't wander too much from the rally alone.[3]

Once conflict began, he continued, the Proud Boys had license to fight: "If shit goes hot let your hands go. Finish your business." Pruitt again was the first to respond, reporting, "National guard is out."

---

[3] "Rufio" likely refers to Ethan Nordean, who has been charged for his role coordinating the Proud Boys' attack on the Capitol on January 6. Superseding Indictment, *United States v. Ethan Nordean, a/k/a Rufio Panman, et al.,* No. 21-cr-75 (TJK), ECF No. 380 (D.D.C. June 6, 2022).

### *Social Media Posts*

Pruitt also posted to social media about his plans for January 6. His posts appeared intended to communicate a message of intimidation. For example, Pruitt posted the photograph of himself at a weightlifting bench that he had shared in the Proud Boys' encrypted chat, along with the caption "Getting ready for these clowns on Wednesday. Wrong patriot to fk with."

In one video, posted to Parler and the encrypted chat on January 4, Pruitt declared, "[a]ntifa…DC, mayor jackoff, bring it motherfuckers. Y'all motherfuckers just started a war. You wanna arrest Enrique. Ok, we got you. You got to arrest fucking all of us. Cause I'm going fuckin balls to the wall…I'm ready, I'm fuckin' ready…" Pruitt proceeded to put in a mouthguard that said "FIGHTR." He took out the mouthguard and held up the glove with knuckle pads that he would later wear to the Capitol. "I only got one glove, you know why? I only need fuckin one. I'm a one-hitter quitter." At the end of the video, he said, "you wanna go? We can fucking go. Wrong motherfucking patriot to fuck with. I'm going for your fucking heads."   (Exhibit 1).   On the encrypted chat, Downtown GIMLI responded, "Fuckin right" and "Skol!" ("Cheers!")



As depicted below, the morning of January 6, Pruitt also posted to social media a photograph of himself holding a rifle.

### *Pruitt's Coordination with the Proud Boys on January 6*

On January 5, Pruitt provided "security" for a protest at the Capitol. He also met up with members of the Proud Boys at a hotel, displaying a hand symbol associated with the Proud Boys:



Pruitt sent the photo with the message, "Game on." He was wearing his cut-off t-shirt with the Punisher logo.

21

The next morning, Pruitt returned to his apartment to meet with another Proud Boy from the Maryland-DC chapter. The other member had coordinated with Pruitt over an encrypted message the day before, telling Pruitt, "I am bringing some tools with me. So I wanna make sure that they are safe guarded and if we need them they're close by." He arrived with an AR-15-style rifle. He then filmed Pruitt holding the AR-15 in Pruitt's apartment, as Pruitt stood on a Black Lives Matter banner taken from the same church whose banner Enrique Tarrio had burned. Pruitt posted some of the images to social media.

 

Pruitt had previously advertised the Black Lives Matter banner in the encrypted Proud Boys chat, describing it as his "new floor mat" and sending photos. In case the church logo in the photographs was too small to read, Pruitt spelled it out for the group: "Gotta figure what to do with my new flag lol, came from same church btw way lol."

22

Pruitt and the associate also photographed themselves flashing the "OK" hand sign.



Pruitt and this individual left Pruitt's apartment and went downtown to meet up with other members of their Proud Boys chapter at the rally. As seen below, the individual with Pruitt had put on tactical gear. Around 9 a.m., another participant in the encrypted chat mentioned that he was on his way to the ellipse. Pruitt said, "We got some hitters."



That morning, Pruitt had also exchanged text messages with his Proud Boys associate from New York. Hours before the breach occurred, the exchange referenced storming the Capitol:

> Associate: "I hear it's going down. Storm the steps!!!   I'm hearing shot [sic] got crazy last night!"
> Associate: God speed today!!! I hope it goes down!"
> Pruitt: "Thanks bro. Trust me I'm good lol"
> Pruitt: "They Don't want these hands"

23

Associate: "I hope Trump declares war. It doesn't look good for the Republic. My god, what is happening!!?!?"
Pruitt (responds with screenshot of himself holding rifle in his apartment):
Associate: "Wow. Lost Georgia. This is unreal."

The Maryland-DC Proud Boys, including Pruitt, continued to coordinate. Between 10:30 a.m. and 12:30 p.m., they exchanged encrypted messages as they sought to find other members of their group. At 12:15 p.m., another aspiring Maryland-DC Proud Boy left a voicemail for Pruitt: "Yo this is Jimmy Jam…just trying to find out where you guys are man, we're out here at the meeting point."

At about 12:30 p.m., Pruitt began to move from the area of the rally toward the Capitol. On the encrypted application, at about 1:20 p.m., Pruitt responded in the encrypted chat to Jimmy Jam, who by then was at Third Street and Pennsylvania Avenue, closer to the Capitol, that "we are at the food truck."

### *Confrontation #1: The Northwest Lawn*

Pruitt entered the Capitol Grounds and, by around 2:00 p.m., had advanced to the northwest lawn, near stairs that led to the Upper West Terrace. A police line had formed to try to prevent unauthorized individuals from accessing the stairs and to protect equipment set up near the stairs.



24

Captain E.G., a 28-year veteran of the Capitol Police, was in the area.   When he was interviewed in April 2022, more than a year after the Capitol attack, he immediately remembered Pruitt, who was walking around the police line on the northwest lawn in a threatening manner. Pruitt eventually made his way behind the police line. Officers repeatedly asked him to move. He refused, and told the officers, in substance, "make me." He shouted at officers to move and warned that the rioters would overrun the police line if they did not. At one point, Pruitt made a display of putting on his tactical glove, which had visible knuckle pads. Based on Pruitt's behavior and appearance, Captain E.G. perceived him—among the hundreds of rioters in the area—as the biggest threat that he was facing at the time. Before any physical confrontation could occur, a series of events pulled Captain E.G.'s attention away from Pruitt: a rioter climbing the staircase fell off, rioters overran the police line, and Captain E.G. was assaulted by another rioter and fell to the ground.

A video filmed by another rioter captured Pruitt on the northwest lawn. At about 2:09 p.m., rioters broke through the police line on the staircase that led to the Upper West Terrace and an entrance to the Capitol. Cheers broke out among the rioters. Seeing an opening, Pruitt and other rioters joined the others on the stairs. Pruitt appeared to be moving with an individual wearing a paintball-type mask.



Pruitt climbed a bike rack being used as a ladder to reach the stairs. By 2:12 p.m., Pruitt was on the staircase, moving toward the Upper West Terrace. The individual in the paintball-style mask was right behind him.



***Pruitt Enters the Building and Hurls a Sign***

By 2:13 p.m., Pruitt had climbed the stairs and reached the Upper West Terrace. He walked up a ramp and hopped over a railing to move toward an entrance to the Capitol. *See* https://twitter.com/mattlaslo/status/1346898208312713223 (video of Pruitt hopping over ramp).

At approximately 2:13:57 p.m., less than two minutes after the Capitol was first breached by rioters entering through the Senate Wing Doors, Pruitt walked through those same doors and into the building. Contrary to what Pruitt would later claim, there were no police officers visible outside or inside the doors, and certainly none waving rioters in. Alarms sounded, and there was glass and overturned furniture on the ground.



Pruitt turned right and walked down the hallway. He found himself in an atrium. He picked up a wooden sign, lifted it over his head, and hurled it across the room. Journalists from the *Washington Post* and *Bloomberg* (Exhibit 2) captured the moment.



***Confrontation #2: The Crypt***

At around 2:15 p.m., Pruitt was one of the first rioters to enter the Crypt—an area that would soon see a major stand-off between rioters and the police. When Pruitt first arrived, he and the rioters were outnumbered by police, who sought to hold off the rioters to allow more time for Congress to evacuate. The officers ordered Pruitt and the other rioters in the area to leave. An officer carrying a long gun then entered the area, enraging Pruitt. Other officers asked the officer with the long gun to back away in the hopes of easing tensions. Pruitt then calmed down, and the officers persuaded him and the other rioters to turn around.



Followed by the officers, Pruitt and the other rioters turned around and entered a hallway leading back toward the Senate Wing Doors. Additional rioters were breaching the Capitol through those doors and arriving in the same hallway, though, and the rioters eventually outnumbered police. One officer recalled unsuccessfully trying to call for backup. In the hallway, rioters assaulted police officers. They threw objects, including a wooden plank and a base plate from a flag stand, at officers. One officer was hit in the groin with the wooden plank and guided back to safety in the Crypt by a fellow officer. Another assaulted officer was also carried to safety by his colleagues. With their growing numerical advantage, rioters pushed police into the Crypt.

Pruitt reentered the Crypt toward the front of the group of rioters, dramatically bouncing back and forth while looking toward officers, as if preparing for a fight. He pointed his finger at police, appearing to taunt the officers. Rioters continued to fill in the Crypt behind him. Pruitt remained on the front lines as a standoff with police began. Several members of the Capitol Police who defended the Crypt recalled Pruitt displaying what they called "pre-assault indicators." Officer J.M. recalled that Pruitt he was "amped up" and took a "fighting stance." Officer B.A. recalled Pruitt's "clenched hands" and aggressive yelling. Officer N.W. remembered Pruitt

30

adjusting his tactical glove. Lieutenant P.C. remembered Pruitt telling officers he was going to be a problem for them, adjusting his tactical glove, and appearing to position his body for a fight.

Pruitt's aggressive stance drew the officers' attention and caused them to take a defensive position—at a time when they also had to keep their eyes on hundreds of potential threats from the growing mob, other members of which yelled racial epithets at certain officers, screamed that they were traitors, and begged for the police to step aside and "let us get to them" (members of Congress). Officers believed that Pruitt, with his aggressive stance and appearance, was inciting and emboldening rioters behind him. During this time, Pruitt's Proud Boys contact from New York sent him a text message: "Storm that motherfucker!!!"

With Pruitt front and center, the situation in the Crypt became more and more heated. Members of the mob raised their fists in the air. A skirmish occurred at about 2:21 p.m., when some rioters at the front of the mob began to push against the police, almost as if they were in a mosh pit. Pruitt braced himself against a pillar nearby, poised for action.



From **ELIJAH SCHAFFER** ✔

188        3K        4K

The police stopped this small number of rioters from breaking through, but the standoff continued. Rioters yelled at the police to "let us through," saying "you can't stop all of us." Pruitt was still at the front.



Capitol Police surveillance shows the Crypt filled with rioters at about the same time.



Having perceived Pruitt as a leader of the mob, certain members of the Capitol Police attempted to persuade Pruitt to convince other rioters to back off. One officer, T.A., recalled telling Pruitt that he had a right to protest, but that this was not the way to exercise that right. He further recalled that Pruitt had been initially aggressive, but later seemed to calm down and did try to calm some others in the crowd and keep them from assaulting police.

By that point, however, the rioters did not need to assault officers to advance; given their superior numbers, they simply had to move forward. At about 2:25 p.m., that is what they did. Several officers recalled being pushed against the walls as the mob overran the police line; one remembered that he was pinned so tight that he could not move his harms to secure his weapon and had difficulty breathing.

### Pruitt Leaves the Crypt and Throws a Chair

Once many members of the mob had pushed through and the Crypt had cleared out somewhat, Pruitt did not turn around and leave. He did not try to convince anyone else to do so. Instead, he continued through the Capitol.

Meanwhile, some Capitol Police officers who had been in the Crypt retreated to the east and then descended a staircase to the Capitol Visitor Center, in the basement level of the Capitol. Tunnels from the Visitor Center led to the office buildings where staffers and members of Congress worked. The retreating officers tried to close crash doors in a hallway leading from the Crypt to seal off the path from the rioters, but rioters used objects such as flags to force the doors open. Pruitt and other rioters then went down that hallway and down the stairs to the Visitor Center. As Pruitt did so, he held his hand over his face, to protect against the chemical spray that was in the air. Below is a screenshot from 2:30:51 p.m.

33



Rioters descending into the Visitor Center began throwing chairs down the stairs. The retreating officers, joined by some others who had arrived from other parts of the Capitol, gathered at a set of doors to block rioters' access from the Visitor Center to the tunnel system. At the bottom of the stairs, Pruitt, now with a drink in hand, tossed a chair in the direction of the officers.



He also reunited with the individual with the paintball-type mask. The two split away from other rioters and continued through the Visitor Center on their own.

***Confrontation #3: Senator Schumer***

At around 2:29 p.m., members of the Senate began evacuating from the Chamber. Once the Senate Chamber was locked down, Capitol Police Special Agent M.L. pulled Senator Schumer out of his chair and brought him toward the doors.[4]  At approximately 2:31 p.m., Senator Schumer evacuated the Chamber. He and Special Agent M.L. rushed down to the first floor. Along the way, two more members of the security detail, Sergeant K.F. and Special Agent J.I.—who drew his long gun, aware of the threat—joined them, and the group moved toward an evacuation vehicle. They descended to the basement level.

Senator Schumer and his security detail hurried through the Senate Subway toward the Visitor Center and their evacuation site. Below is an image from Capitol Police surveillance video shown at President Trump's second impeachment trial. A yellow arrow points to Senator Schumer.



---

[4] Special Agent M.L. has submitted a statement concerning the impact of January 6 from his perspective, which is attached as Exhibit 3 to this filing.

They approached an elevator bank and crouched behind the recessed walls for cover as they waited for the elevator. Members of the detail could see unauthorized individuals in the distance, inside the Visitor Center. The leader of the detail, Sergeant K.F., peered out again to make sure the individuals were still at a distance. As he told the FBI, he would never forget what he saw next: a bald, bearded man, wearing a black tank top with a Punisher logo, coming toward him. Sergeant K.F. identified that man as Pruitt. Pruitt and Sergeant K.F. made eye contact. Pruitt's speed toward the detail—and Senator Schumer—began to increase.

Special Agent M.L. saw Pruitt too. He later estimated that Pruitt had been so close that he could have reached the Senator in four or five seconds.

Sergeant K.F. yelled, "evac, evac, evac!" He knew they needed a new evacuation route. Senator Schumer—who was 70 years old at the time—and his detail ran. They ran from the elevator and back down the ramp. Sergeant K.F. had turned away from Pruitt as the group fled the area but recalled hearing Pruitt getting louder behind him. He felt as though they were being chased.



36

At the end of the ramp, officers closed and locked the doors. The security detail and the Senator pursued a secondary evacuation route. Once the doors were being closed, Pruitt turned around and retraced his steps. Soon after, Senator McConnell and his security detail came to the same doors, also planning to enter the ramp and evacuate; they had to turn back as well.

### Confrontation #4: The Capitol Visitor Center

Back in the Visitor Center, police continued to guard the set of double doors that led to tunnels to other areas of the Capitol. By then, Lieutenant F.H., who had 20 years of experience as a Capitol Police officer, had arrived. Rioters yelled for others to join them and badgered the police to let them through. Pruitt went to the front of the group.

One rioter then sprayed the officers with a chemical irritant, and Lieutenant F.H. decided to start arresting rioters because verbal commands were not working to disperse the crowd. A skirmish ensued as police and some rioters started pushing and wrestling.

Pruitt stayed nearby. Officers recalled him taunting Lieutenant F.H. and challenging him to fight. They recognized him as an instigator, even if he was not physically putting his hands on the police. Pruitt threatened another officer, who recalled him saying, "you better stop eyeballing me."[5]

Lieutenant F.H. then heard over the radio that shots had been fired.[6] He decided to pursue a new course to try to diffuse the situation. He motioned for the rioters to gather around. At the time, Pruitt had also been trying to gather the rioters, but the rioters went to Lieutenant F.H. and

---

[5] The officer, Sergeant C.T., has written a statement regarding the impact of January 6, which is attached as Exhibit 4 to this filing.

[6] This likely was the shot fired at Ashli Babbit as she attempted to breach the Speaker's Lobby.

the other officers instead. Pruitt followed suit and made his way to the front of the group, his face close to Lieutenant F.H.'s.



Lieutenant F.H. announced that shots had been fired. He asked the rioters if that was why they were there, if that was an association they wanted—to be part of a mob that had led to people getting shot. Lieutenant F.H.'s strategy worked. Pruitt and the other members of the mob turned around and left the Visitor Center. Approximately 40 minutes after entering the Capitol, Pruitt made his way back to the Senate Wing Doors, where he climbed out through a window. Outside the building, he shook his hand, as if he had hit something.

### *Leaving the Capitol and Arrest*

At around 3:00 p.m., Pruitt left the Capitol Grounds and went toward the area around 14th Street NW to meet up with Proud Boys at a hotel. He also began to exchange text messages regarding his exploits. One contact wrote him, "was that you at the capital about to go at it with the cops????" He replied, "Yes." She said, "I was there too" and "but not inside." Pruitt replied,

"inside was fun." He wrote to another, potentially misrepresenting some of his actions on January 6 but nonetheless making clear his penchant for violence and violent rhetoric, "Yea I got sprayed, my hand is swollen, cop came at Me for no reason. So…I dropped his ass."

At around 5:00 p.m., another member of the Proud Boys chat warned Pruitt, "Get out of the building they are coming for you." Pruitt said "we are gone." When another fellow Proud Boy—whose username indicated that he was the vice president of the Maryland-DC Proud Boys chapter—sent a headline, "JUST IN - Officer shaking to the core as the crowd rushes past in the U.S. Capitol," Pruitt replied that he remembered the officer. The individual identifying as the vice president then sent a video of U.S. Capitol Police Officer Eugene Goodman being chased upstairs by rioters. He then commented, "I have found you nigga, don't you run from me little nigga." Pruitt responded "haha." Pruitt then sent the vice president a video of himself in the Crypt from social media, and said, "In this bitch."

Pruitt also received messages with Proud Boys slogans "uhuruu mother fuker" and "proud of my boy." Another Proud Boy wrote to Pruitt, "Jacked! Your on fox bro! Lol."

Shortly before 9 p.m., in the encrypted chat, another member announced that he would be "nuking this group tomorrow and sticking you all in a different one." Pruitt responded, "Why u hate me so much lol." The member responded, "Lol no hate we are just scrubbing our records."

Less than thirty minutes later, Metropolitan Police Department officers arrested Pruitt on 14th Street NW for violating the curfew that the mayor had put in place that night. Pruitt bragged that he had been on Fox News "inside the Capitol." After being arrested, Pruitt told the officers, "I have an ankle bracelet…I might be in trouble for this shit." He worried that the charger for his

monitor was in a hotel room. He yelled that he was being arrested "because I'm fuckin Proud Boy. I hope Antifa's locked up with me too so I can rip their fucking faces off."

While Pruitt was being processed, a Metropolitan Police Department detective recognized him from a photograph published in the *Washington Post*. She and a colleague interviewed Pruitt. They showed Pruitt a picture of himself inside the Capitol. Pruitt launched into an explanation of how "the cops were happy with me because I was trying to stop people from the dumb shit they were doing." He said that he had warned other rioters that the police "have guns and it will be a problem for you if you rush cops." He explained that two officers "were talking to me because they realize I was being reasonable and tried to get me to help back people up." Pruitt said, "I'm all for the cause of Trump but at the end of the day, I wasn't there for the violence." He said, "the point of us being out there is for Trump and back the blue."

### Post-Release Conduct and Media Interviews

Pruitt was initially charged by complaint with violating 18 U.S.C. § 1752(a)(1) (unlawful entry) and released to the High Intensity Supervision Program on January 7, 2021. On the day of President Biden's inauguration, Pruitt was formally sworn into the Proud Boys. He subsequently continued to reference his affiliation through means such as tattoos and social media videos.

While Pruitt was on release, he engaged in threatening behavior, often over social media platforms, sending videos displaying guns, vowing to send another individual "six feet under," and referring to Glock-19 bullets as his "30 friends waiting for" an enemy. He warned someone else, "Fk around and watch your pulse disappear princess." He referred to another individual getting a "full clip through if he doesn't shut the fuck up." Pruitt also posted a video where an AR-15 type gun was visible while the Proud Boys slogan "FAFO" was displayed; in another video, he stared

at the camera while a song about digging a hole (*i.e.,* a grave) played. Another woman sent a message to a friend saying that Pruitt had threatened her ex-boyfriend. Some of the individuals involved reported the threats to Pretrial Services and to the government, and the government described them in a January 6, 2022 filing (ECF No. 33).

Pruitt also gave several media interviews while on release. In June 2021, CNN featured him as "The Proud Boy" in an online interactive segment entitled "Assault on Democracy." https://www.cnn.com/interactive/2021/06/us/capitol-riot-paths-to-insurrection/josh-pruitt.html. In the feature, CNN reported that, in June 2021, Pruitt had posted a video with a caption "Do I regret Jan 6th? Not even a little!!! Patriots rise!!!" *Id.*

CNN also aired clips from Pruitt's interview in multiple segments on the network. In one clip, Pruitt said, "We didn't storm any Capitol, OK?  We did protest. We peacefully protest" against "cheating" in the election. CNN Special Reports, *Assault on Democracy*, transcript available at https://transcripts.cnn.com/show/csr/date/2021-12-05/segment/02. The interviewer, Drew Griffin, asked Pruitt, "You don't feel any responsibility?" Pruitt said, "I do not, absolutely not. I don't feel I did anything wrong." *Id.* Griffin asked Pruitt, "What did you do?" CNN Special Reports, *Attack on Democracy,* available at https://transcripts.cnn.com/show/csr/date/2021-12-05/segment/03. Pruitt replied, "Walk in through a front door being held open by cops that waved me in." *Id.* Griffin replied, "Now you know that's not true." *Id.* Pruitt doubled down: "No, I know that is true. There's proof of it. There's video of it. And when I walked into the front door, the cops were at the door and they were standing to the sides of the door and they were waving people in." *Id.* He reiterated, "I didn't do anything." *Id.* Pruitt acknowledged being with about 20 "guys that were part of the Maryland Chapter" of the Proud Boys near the rally on the morning of January 6,

but (in tension with the messages Pruitt and other Proud Boys exchanged)[7] said, "I didn't hear anything about any plans meeting by the Capitol at all." *Id*. On the evening of January 5, 2022, CNN broadcast another interview with Pruitt, where he again denied wrongdoing. *See* https://www.cnn.com/videos/politics/2022/01/05/january-6-capitol-rioters-remorse-charges-sentence-ebof-schneider-pkg-vpx.cnn. Pruitt said, "If you ask me if I would do it again, I wanna say yes, but then I question in the back of my head, would I?" He continued, "I don't feel like I did anything wrong," although "knowing the consequences that came out of it would be the part that would make me question it." Pruitt said he was a "Patriot" merely "protesting" against "what I think is a stolen election." He said, "trying to send me to prison for a few years over this I think is a complete joke."

In an interview with the International Center for the Study of Violent Extremism, Pruitt again claimed that he had been waved into the building; he also said he was looking for an exit when he walked through the building. Anne Speckhard, "A Capitol Rioter's Story," *International Center for the Study of Violent Extremism,* available at https://www.icsve.org/a-proud-boy-capitol-rioters-story/. In an interview with British television network ITV, he said, "Should I really go to prison for walking in a building? Come on." ITV News, "US Capitol riots: The insurrectionists who say they did nothing wrong," https://www.itv.com/news/2021-04-23/us-capitol-riots-the-insurrectionists-who-say-they-did-nothing-wrong.

---

[7] One such example was the message about coming to the "FRONT FUCKING DOOR" of the Capitol that Downtown GIMLI directed the members of the chat to "READ." Another was the January 4 communication stating that "march will be to the capitol building."

*Indictment, Detention, and Plea*

On January 27, 2021, a federal grand jury returned an indictment charging Pruitt with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Destruction of Government Property (under $1,000) in violation of 18 U.S.C. § 1361, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F). ECF No. 7. A superseding indictment, returned November 10, 2021, included the same charges. ECF No. 30.

After Pretrial Services filed three reports recommending that Pruitt be removed from supervision because of repeated curfew violations, on January 6, 2022, the government moved to revoke Pruitt's release. ECF No. 33. In addition to the curfew violations, the government's motion noted (1) that Pruitt had made threats over social media; (2) that an owner of a residence where Pruitt had lived obtained a protective order against him; (3) the threatening behavior described in the victim impact statement from a former girlfriend, submitted in connection with Pruitt's 2021 sentencing for violating a civil protection order; and (4) Pruitt's denials and lack of remorse displayed in his CNN interviews. On January 13, 2022, the Court ordered Pruitt detained pending trial. ECF No. 37. On February 4, 2022, the Court set a July 2022 trial date. On June 3, 2022, Pruitt pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), pursuant to a plea agreement. ECF No. 60.

In July 2022, as required by his plea agreement, Pruitt participated in an interview with the FBI. In the interview, Pruitt declined to give the full names of his Proud Boys contacts, although he acknowledged participating in the encrypted chat and meeting Proud Boys at multiple events. He repeated that he had not done anything violent, did not want physical contact with the police, and claimed he carried the tactical glove in anticipation of conflict with Antifa. He said he had met the individual with the paintball mask (with whom he encountered Senator Schumer) at the Capitol because the individual recognized Pruitt from social media.

Pruitt did not express significant remorse, aside from saying it was a "bad idea" to have thrown the sign. While claiming he wanted no part of violence that day, he refused to acknowledge the inherent threat posed by a mob that he eagerly joined.

### III.    STATUTORY PENALTIES

Pruitt now faces sentencing on one count of Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, the maximum statutory penalties are up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

### IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." As a matter of administration and to secure nationwide

consistency, the Guidelines should be the "starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The government agrees with the Guidelines calculation in the PSR. That calculation, which is consistent with the calculation in the parties' plea agreement, is as follows:

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | **Total** | **25** |
| Acceptance of Responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **22** |

*See* Plea Agreement at ¶¶ 5(A).[8]

The U.S. Probation Office calculated the defendant's criminal history as category III, which is not disputed. PSR ¶ 76. Accordingly, consistent with plea agreement, Pruitt's Guidelines imprisonment range is 51 to 63 months' imprisonment.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is ultimately guided by the factors set forth in 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need

---

[8] Based on the facts and circumstances of Pruitt's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 51-63 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A.      **Nature and Circumstances of the Offense**

The attack on the Capitol on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in

person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Here, the nature and circumstances of the offense heavily favor a significant term of incarceration for several reasons, principally (1) the evidence of Pruitt's planning, including preparation for and promotion of violence and coordination with the Proud Boys—a group Pruitt sought to join; (2) Pruitt's role in confrontations with the police as well as with Senator Schumer and his detail; and (3) Pruitt's enduring lack of remorse and minimization of his conduct.

Before January 6, Pruitt enthusiastically prepared for a violent confrontation on that day. He sourced tactical gear. Two weeks before the event, he even planned his unseasonable attire, a t-shirt designed to send a message: with the logo of the Punisher, a violent vigilante anti-hero; Pruitt would cut the sleeves off, to show off his muscled arms, expressing that he was a "one-hitter quitter." He posted many videos and images threatening violence on January 6, including one where he dramatically inserted a mouthguard and put on his tactical glove, and one where he held an AR-15—itself a potential violation of D.C. law. These images and videos not only indicate Pruitt's intent (contrary to his claims that he eschewed violence), but they also could have encouraged and emboldened others who saw them.

Pruitt sought to ingratiate himself with the Proud Boys, and his intent was shaped by the Proud Boys' local leadership. As an aspiring recruit of the local Proud Boys chapter, Pruitt coordinated his plans with the chapter, which, on January 6, was under the local direction of "Rich" and the national direction of "Rufio." Pruitt was precisely the type of follower (or aspiring

member) that Proud Boys leadership hoped would join the effort to obstruct the certification of the Electoral College vote: pre-disposed toward violence, hoping to become a full-fledged member of the group, and willing to do whatever was necessary to win their acceptance. Pruitt was also enjoying the celebrity of having taken the oath from Enrique Tarrio in November.

Often through encrypted communications, Pruitt and other prospects and recruits of the local Proud Boys chapter discussed storming the Capitol, civil war, and confrontations with the police. Local chapter leadership, such as Downtown GIMLI, celebrated and encouraged participation, with Pruitt's contributions to his local chapter ranging from the motivational (such as broadcasting his eager participation both in words and menacing photographs) to the logistical (such as sharing ideas for gear, reporting on hotel availability, and offering the use of his apartment). Having recently been fired from his job and "blacklisted" from working in D.C. (according to Pruitt), Pruitt viewed his membership and ascendency in the Proud Boys as a vital part of his future.

As mentioned above, the Proud Boys'—and Pruitt's—planning was not limited to merely attending a rally at the Ellipse. At least as of January 4, the Maryland-DC chapter of the Proud Boys were planning to go the Capitol, and they were encouraging recruits and prospects to go as well. The Proud Boys' top-down "directives" to recruits sought to encourage violence, but avoid scrutiny, telling prospects such as Pruitt that "[o]nce word comes down about the electoral votes, the normies will make a stink" and that if "unrest begins, go with the flow."   Leadership of the Proud Boys knew they were being watched, and they advised their recruits: "Don't be a heat magnet. Proud Boys have a ton of heat in DC." They had been ordered not to wear colors that day. Pruitt was the first in the chat to respond to the directives: "sounds like a plan." And Pruitt showed

his embrace of the plan through his actions on January 6—leading the charge, going with the flow, but attempting (in vain) to avoid scrutiny.

As the encrypted messages and Pruitt's videos demonstrate, Antifa was not the target of the Proud Boys' plans for violence on January 6. This was a day about the electoral votes. The Proud Boys sought to intimidate Congress and anticipated conflict with police who might stand in their way (*i.e.,* "if the police try this shit it is our CONSTITUTIONAL duty to take them out").

Consistent with what he later told the media and police, at one point, Pruitt did say in the encrypted chat, "I'm not hitting a cop period." But this was not borne of a wish to promote peace. Indeed, Pruitt even bragged in a message that he *had* "dropped" an officer who had come at him, though the government has not corroborated that claim. Importantly, and as he discussed with the Proud Boys, Pruitt knew that he would be a visible member of the mob; he had to be careful to avoid getting caught. And, in the same January 5 conversation, Pruitt explained "we need to be tactical": some recruits, like Pruitt, could distract the police while others fought; moreover, the Proud Boys should wait to "strike when they come first period. And at that point we put in work." Using this strategy, they could claim to have been provoked into engaging in the violence that they desired.

Pruitt executed this plan when he stormed the Capitol. He tried to provoke conflict, displaying multiple "pre-assault indicators." Even Pruitt's outfit was calculated to send a message. And it worked. It is noteworthy how many officers recalled Pruitt, even when the FBI did not interview many of them until more than a year since January 6 had passed, and even when they had confronted hundreds of others that day. Pruitt was that visibly threatening—but not just because of what he was wearing, but because of what he said and did.

49

He confronted officers on the northwest lawn, refusing orders to leave. He made a show of putting on his glove –in view of the police, not Antifa. He lifted a sign over his head and threw it across an atrium. He displayed threatening behavior at the front of a mob in the Crypt. After the mob overran the police and the crowd thinned, he did not leave; he moved, through tear gas, deeper into the Capitol, where the threw a chair. He confronted another group of officers in the Visitors Center, again standing out as an agitator. It took a report of actual gunfire to convince Pruitt to leave the Capitol, after nearly 40 minutes inside the building.

And Pruitt's confrontations were not limited to law enforcement. He aimed to halt the certification. He personally forced a 70-year-old Senator to run and find another path to safety. Among all the rioters who stormed the Capitol, it is a notorious distinction.

True, two officers who were in the Crypt did corroborate Pruitt's claim that they engaged with him to try to calm the crowd. One remembered him making some effort to do so. But, at that moment, the rioters did not have to hit the police to achieve their goal. They had such strength in numbers that all they had to do was move forward, which is exactly what they did. Pruitt's encrypted chats with the Proud Boys also indicate that these actions were consistent with his "tactical" approach: do not be the first to hit the police; wait, then strike back. And these officers did not report that they spoke with Pruitt because they saw him as particularly reasonable. Rather, he seemed like someone who had assumed a leadership role in the mob. Minutes later, moreover, Pruitt was throwing a chair and agitating again.

Finally, since his participation in the Capitol breach, Pruitt has minimized his conduct and spread false information. He claimed that officers at the doors had waved him in; Capitol Police surveillance video of the Senate Wing Doors at the time of Pruitt's entry shows that this is false.

He denied awareness of plans to go to the Capitol, after having actively participated in a Proud Boys chat that explicitly discussed surrounding the Capitol and, on January 4, described a plan to march there. He said, "we didn't storm any Capitol, OK? We protest. We peacefully protest." Having witnessed—and participated in—multiple confrontations with the police, Pruitt was an eyewitness to the fact that this was untrue. Several months after January 6, well after the extent of the injuries and trauma caused by that day had come to light, he posted on social media: "Do I regret Jan 6th?" the caption read. "Not even a little!!! Patriots rise!!!"   A year later, on CNN, he said, "I don't feel like I did anything wrong."

Pruitt has never denied entering the building. But he has repeatedly minimized his conduct as a simple trespass. As recently as his July 2022 FBI interview, he struggled to acknowledge the obvious threat that a violent mob posed. As someone who saw the mob attack and overrun police multiple times, and who saw Senator Schumer hustled to safety by his security detail, Pruitt should have been aware of that threat. He did not need to hit an officer to pose a danger.

### B.  The History and Characteristics of the Defendant

Pruitt's history and characteristics also favor a lengthy term of imprisonment. Although Pruitt's radicalization and participation in *political* violence appears to be relatively recent, his criminal history is lengthy. While this will be Pruitt's first felony offense, he has a string of convictions beginning at age 18 and continuing to his most recent conviction in November of 2021, at age 39. The Guidelines range actually undercounts his criminal history because he has more than four one-point convictions.

Pruitt's criminal history includes previous instances of threatening behavior. In 2013, Pruitt pushed a police captain with closed fists and then struggled wildly to resist arrest, leading to

charges for assault on a police officer (Pruitt later completed a diversion program, and the government dismissed the case prior to sentencing). PSR ¶ 69. In 2016, he was charged with stalking and harassment, before ultimately being convicted of harassment. *Id.* ¶ 70. As described above, he was arrested for violating a protection order a little over a week before January 6, having harassed and threatened a former girlfriend. *Id.* ¶ 73. While Pruitt was on release in this case, another individual obtained a protection order against him. *Id.* ¶ 86.

Moreover, Pruitt was on both probation *and* pretrial release (with an ankle monitor) on January 6. *See* PSR ¶¶ 71, 73. Multiple forms of supervision did not deter him from planning to commit acts of violence on January 6, publicly posting a picture of himself holding a rifle that morning (itself likely a violation of D.C. law and Pruitt's conditions of release), planning with the Proud Boys, storming the Capitol, threatening officers, and throwing a sign and a chair. His concern about violating his release conditions emerged only when he was arrested for the curfew violation, fretting that his ankle monitor might lose its charge if he spent the night in jail. While on release in this case, he issued more threats—leading another individual to get a protective order against him—and defied his curfew so chronically that the Court revoked his release. He also used steroids while on release and did not participate in alcohol abuse treatment, despite being ordered to do so. *Id.* ¶ 108. This conduct reflects a serious and troubling lack of judgment and repeated breaches of multiple courts' trust—and by a 39-year-old father of two. In summary, Pruitt's crimes on January 6 were not an isolated event in an otherwise law-abiding life; he has a history of defiant, threatening, and even violent behavior.

C.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Pruitt's criminal conduct, corruptly obstructing an official proceeding (and doing so while on probation and pretrial release), shows disrespect for the law.

D.    **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                        at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

[10] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, Pruitt has multiple prior convictions, and committed the instant offense while on probation and pretrial release, demonstrating that high-intensity supervision and shorter or suspended sentences have not deterred him from continuing to commit crimes. Second, although Pruitt has now pleaded guilty, his media and social media statements after January 6 reflect a lack of remorse, minimization of his wrongdoing, and the continuation of a pattern of threatening behavior. As his 2022 CNN interview reflects, his chief regret about January 6 is the consequences it has had for his own life, not for others, such as victims of the attack. Third, the strategic approach that Pruitt (and other members of his Proud Boys chapter) employed and for which they advocated was designed to avoid scrutiny while still provoking violence. These tactics included not wearing colors, letting the "normies" act out first and then following suit, using some members to distract police while others commit violence unseen; provoking the police to strike first; and attempting to delete evidence (the encrypted chat they planned to "nuke"). These efforts to avoid detection while still using violent tactics require greater deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. While the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Pruitt and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other Section 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Reviewing some of the other sentences of felony January 6 defendants, three key distinctions emerge. First, few other defendants have Pruitt's criminal history; as a result, many of their Guidelines ranges are lower, and the need for specific deterrence and their history and characteristics may less heavily favor a substantial term of imprisonment. Second, in few other cases has the government demonstrated the extensive preparation for violence and coordination with others (here, the Maryland-DC chapter of the Proud Boys) present here. Third, in none of the

55

cases discussed below did the defendants directly encounter a member of Congress and him to flee, as Pruitt did.

As of the date of this sentencing memorandum, only two January 6 defendants have been sentenced after pleading guilty to violations of 18 U.S.C. § 1512(c)(2) (and no other offenses), as Pruitt will be. Jacob Chansley, the "QAnon Shaman" who wore a Viking hat with fur and horns and carried an American flag with a spear tip, made it to the Senate Floor. Gov. Sentencing Mem., *United States v. Chansley,* 21-cr-3 (RCL), ECF No. 81, at 5, 10-11. Chansley left a note on a paper on the dais in the Senate Chamber that said, "ITS ONLY A MATTER OF TIME JUSTICE IS COMING!"   This threatening language supported the application of the +8 enhancement for causing or threatening injury or property damage under U.S.S.G. § 2J1.2(b)(1)(B), resulting in a 41-51 month Guidelines range. *Id.* at 14 n. 15. The government recommended a 51-month sentence, and Chansley received a sentence of 41 months' imprisonment.

Like Pruitt, Chansley made some statements on social media before January 6 anticipating violence, although the government presented no evidence that he coordinated his plans with others, and his preparation for violence did not appear to be as specific as Pruitt's. *Id.* at 5. Chansley's history and characteristics, moreover, significantly diverge from Pruitt's: he had no criminal history. *Id.* at 19. And, in contrast to Pruitt's post-January 6 media statements, Chansley turned himself in to the FBI and issued an apology. Def's Sentencing Mem., *United States v. Chansley*, 21-cr-3 (RCL), ECF No. 80, at 3-4. Chansley also had documented mental health issues. *Id.* at 5-6.

Paul Hodgkins, like Chansley, also went to the Senate Floor. Gov. Sentencing Mem., *United States v. Hodgkins,* 21-cr-188 (RDM), ECF No. 32 at 4. The government requested 18

months' imprisonment; Judge Moss sentenced Hodgkins to 8 months. Hodgkins neither committed nor incited violence or property damage on January 6. *Id.* at 12. Consequently, he did not receive the +8 Guidelines enhancement. He also had no criminal history, and he expressed a desire to plead guilty from the outset of the case; he was the first January 6 defendant to be sentenced for a violation of Section 1512(c)(2) (or any other felony charge). *Id.* at 13.

Additional defendants have been sentenced for violations of Section 1512(c)(2) as well as other crimes. Scott Fairlamb, 21-cr-41-RCL, who pleaded guilty to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1), was sentenced to 41 months' incarceration. Fairlamb, like Pruitt, entered through the Senate Wing Door about a minute after the initial breach. While Fairlamb brandished a police baton and assaulted a law enforcement officer while inside the Capitol, there are mitigating factors present in Fairlamb's case that are not present here. Fairlamb, unlike Pruitt, showed sincere remorse for his actions; he was also one of the earliest felony pleas in a Capitol riot case. *United States v. Fairlamb*, 21-cr-120 (RCL), Sen. Tr. at 37. Fairlamb was also in Criminal History Category I, resulting in a lower Guidelines range, and his case did not include significant evidence of planning and coordination. Gov. Sentencing Mem, *United States v. Fairlamb*, 21-cr-120 (RCL), ECF No. 50, at 20.

Another potential comparator is Greg Rubenacker, who received a sentence of 46 months' imprisonment after pleading guilty to all charges in his indictment, including violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1). As in Pruitt's case, Rubenacker was at the front of a mob (the mob pursuing Officer Eugene Goodman) that threatened officers and ignored police demands. Rubenacker later swung a water bottle and threw a liquid toward officers. Gov. Sentencing Mem., *United States v. Rubenacker,* 21-cr-193 (BAH), ECF No. 56, at 7-27. While

57

Rubenacker had physical contact with police (resulting in the assault charge), Rubenacker had no criminal history, and the government introduced no evidence of preplanning or coordination with others. His Guidelines range was 41-51 months. *Id.* at 32.

Sixty-eight-year-old Duke Wilson received a sentence of 51 months after pleading guilty to charges of violating 18 U.S.C. §§ 1512(c)(2) and 111(a), having participated in the attack on police in the tunnel on the Lower West Terrace. *United States v. Wilson,* 21-cr-345 (RCL). His Guidelines range was 41-51 months. Unlike Pruitt, Wilson was in Criminal History Category I and the government's sentencing memorandum presented no evidence of plans for violence, social media statements, coordination with others, or lack of remorse. Gov. Sentencing Mem., *United States v. Wilson,* 21-cr-345 (RCL), ECF No. 29, at 9-17. Wilson also did not enter the Capitol Building. *Id.*

Pruitt's case is distinguishable from Matthew Miller's, who was sentenced to 33 months' imprisonment for violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) after spraying a fire extinguisher and throwing batteries at the police. *United States v. Miller,* 21-cr-75 (RDM). Miller was a 22-year-old with no criminal history whose case also included no presentation of evidence of planning or coordination. Gov Sentencing Mem., *United States v. Miller,* 21-cr-75 (RDM), ECF No. 67 at 34-35. He did not enter the Capitol, and his Guidelines range was lower than Pruitt's— 41-51 months. *Id.* at 33. The Court noted both his age and exemplary behavior on pretrial release— another significant way in which his case differs from Pruitt's—when imposing a sentence.

Other sentences for January 6 defendants, meanwhile, have been equal to or higher than the sentence the government recommends for Pruitt—including the sentences imposed in *United States v. Ponder*, 21-cr-259 (TSC) (60 months) and *United States v. Palmer*, 21-cr-328 (TSC) (63

months), and after trial in *United States v. Reffitt*, 21-cr-32 (DLF) and *United States v. Robertson*, 21-cr-34 (CRC) (87 months each). In some respects, each case was more aggravated than Pruitt's; in other ways, less so. For example, Palmer assaulted officers, but the government did not present evidence that he engaged in planning, and he had no criminal history points. Gov. Sentencing Mem., *United States v. Palmer,* 21-cr-328 (TSC), ECF No. 30, at 10-21, 27-30. Accordingly, given the unique combination of factors in this case, a 60-month sentence here would not create an unwarranted sentencing disparity.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[11] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pruitt must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Pruitt played in the riot on January 6.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.[13] *Id.* Pruitt's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VII.   FINE

The government does not seek a fine in this case. Pruitt's conviction under Section 1512 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994). As the PSR notes, Pruitt has attempted to raise funds for attorney fees using GiveSendGo but had not received any donations. PSR ¶ 100.

---

[12] Unlike under the Sentencing Guidelines, for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[13] As noted above, a more recent analysis indicates that losses exceed $2.7 million.  *See* note 1 *supra*.

## VIII.   CONCLUSION

On January 6, Pruitt repeatedly confronted police, leaving a vivid memory of the threat he posed. He nearly reached the Senate Minority Leader. He coordinated with DC/Maryland Proud Boys, planned for violence, and advertised his desire to commit violence that day. He has criminal history and committed this crime while on probation *and* pretrial release. For these reasons, and for all the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 60 months—within the Guidelines range as agreed to by the parties and Probation—three years' supervised release, restitution of $2,000, no fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Alexis J. Loeb*
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney
Detailed to USAO-DC
U.S. Attorney's Office
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Office: 415-436-7168
Alexis.Loeb@usdoj.gov